### UNITED STATES v. W. N. PROCTOR & CO.

(Circuit Court of Appeals, First Circuit. January 25, 1906.)

No. 609.

1. CUSTOMS DUTIES—CLASSIFICATION—EXTRACT OF NUTGALLS.

Paragraph 1, Schedule A, § 1, Tarriff Act July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626], providing for tannic acid and tannin, does not include extract of nutgalls, consisting of a mixture of powdered nutgalls and water, which contains some tannin, and from which tannic acid may be produced.

2. SAME—SIMILITUDE—RESEMBLANCE IN MATERIAL.

Extract of nutgalls, containing a considerable percentage of tannic acid, which can be obtained therefrom in its commercial form only by a long series of chemical combinations and precipitations, *held* not to be sufficiently "similar in material" to tannin or tannic acid as to be dutiable at the rate applicable to those materials, by virtue of the similitude clause in section 7, Tariff Act July 24, 1897, c. 11, 30 Stat. 205 [U. S. Comp. St. 1901, p. 1693].

3. SAME—STATUTORY CONSTRUCTION—SETTLED CUSTOMS PRACTICE—CONGRESSIONAL ADOPTION.

A settled practice of the Treasury Department in construing a series of tariff acts during the period of 26 years furnishes a rule of statutory construction of the highest authority; and the rule applied that a practical construction given any provision in a tariff act may be construed as accepted by Congress, and re-enacted into law in subsequent acts containing the same phraseology.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Customs Duties, § 10.]

4. SAME—FINDINGS OF GENERAL APPRAISERS—REVIEWABILITY.

The contention that the findings of the Board of United States General Appraisers as to matters of fact are not reviewable by the courts on appeal from the Board's decisions, and are not to be disturbed where there is evidence to sustain them, *held* not to be supported by the authorities.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For decision below, see 139 Fed. 586, reversing a decision of the Board of United States General Appraisers, G. A. 5,333 (T. D. 24,-395), which had affirmed the assessment of duty by the collector of customs at the port of Boston.

W. Wickham Smith, Special Asst. U. S. Atty. (William H. Garland, Asst. U. S. Atty., on the brief).

J. Stuart Tompkins (Hatch, Keener & Clute, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This appeal relates to customs duties under the act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]. The several importations were described in the various protests as "extract of nutgalls," as "tanning extract," and as "extract of nutgalls." The collector, in transmitting the protests to the board of General Appraisers, described them as "certain extract of nutgalls." The opinion of the Board described the merchandise as "extract of nutgalls," and it appears by that opinion that it was described in the invoices as "tanning extract." The duty was assessed at 50 cents per pound under paragraph 1 of the act of 1897 (chapter 11, § 1, Schedule A, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]), which provides for certain acids, and contains the following with the rest, "tannic acid or tannin fifty cents per pound." The importer thereupon applied to the Circuit Court under section 15 of the customs administrative act, approved on June 10, 1890 (chapter 407, 26 Stat. 138 [U. S. Comp. St. 1901, p. 1933]). That court filed an opinion in which the learned judge expressed the conclusion that the merchandise should have been as-

sessed under paragraph 20 of the act of 1897 (chapter 11, § 1, Schedule A, 30 Stat. 152 [U. S. Comp. St. 1901, p. 1628]). The decree merely reversed the decision of the Board of General Appraisers, and no question as to its form is made before us. Thereupon the United States appealed to us.

In the protests the importers made several alternative claims under various provisions of the statute, among the rest paragraph 22 (30 Stat. 152 [U. S. Comp. St. 1901, p. 1628]), and paragraph 20 in connection with similitude section 7 (30 Stat. 205 [U. S. Comp. St. 1901, p. 1693]).

Paragraph 20 reads as follows:

"Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums and gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing; any of the foregoing which are drugs and not edible, but which are advanced in value or condition by refining, grinding or other process, and not especially provided for in this act, one-fourth of one cent per pound, and in addition thereto ten per centum ad valorem."

Paragraph 22 reads as follows:

"Extracts and decoctions of logwood and other dyewoods, and extracts of barks, such as are commonly used for dyeing or tanning, not specially provided for in this act, seven-eighths of one cent per pound; extracts of quebracho and of hemlock bark, one-half of one cent per pound; extracts of sumac, and of woods other than dyewoods, not specially provided for in this act, five-eighths of one cent per pound."

The essential portion of similitude section 7 reads as follows:

"Each and every imported article, not enumerated in this act, which is similar, either in material, quality, texture, or the use to which it may be applied, to any article enumerated in this act as chargeable with duty, shall pay the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned."

.The United States still adhere to the classification under paragraph 1. Their assignment of errors covers alleged errors alike of fact and law. The only alleged errors of fact to which we need refer are the following:

"(3) The court should have found that extract of nutgalls was more nearly similar in material, character, and uses to tannic acid than to any other article mentioned in the tariff act of July 24, 1897.

"(4) The court erred in finding that the term 'tannic acid,' as used in the trade and commerce of the United States, does not include extract of nutgalls.

"(5) The court should have found that the term 'tannic acid,' as used in the trade and commerce of the United States, includes extract of nutgalls.

"(6) The court erred in finding that extract of nutgalls is not known in the trade and commerce of the United States as liquid tannin or liquid tannic acid.

"(7) The court should have found that extract of nutgalls is also known in the trade and commerce of the United States as liquid tannin or liquid tannic acid."

On the various questions of fact, the Circuit Court expressed an opinion adverse to the contentions of the appellants with reference to alleged errors 4, 5, 6, and 7. In speaking of the propositions to which they relate, the learned judge referred to the fact that there were proofs in the record additional to what were before the Board, and concluded:

"Upon the whole, the testimony regarding commercial nomenclature now presented to the court makes for the importers rather than for the United States." We are satisfied with this conclusion.

The alleged errors of law assigned by the United States are as follows:

"(1) The court erred in holding that the merchandise in controversy was dutiable under paragraph 20 of the tariff act of July 24, 1897 (chapter 11, § 1, Schedule A, 30 Stat. 152 [U. S. Comp. St. 1901, p. 1628]), as nutgalls advanced in value by refining, grinding, or other process, at one-fourth of one cent per pound and ten per cent. ad valorem.

"(2) The court should have held that the merchandise in controversy was dutiable under paragraph 1 of said tariff act (30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]) as tannic acid, or tannin, at fifty cents per pound.

"(3) The court erred in reversing the decision of the Board of United States General Appraisers.

"(4) The court should have affirmed the decision of the Board of United States General Appraisers, and should have dismissed the petition."

It will be noticed that these alleged errors strictly involve only one proposition, and that is that, as between paragraph 20 and paragraph 1, the classification should have been as determined by the Board of General Appraisers, under paragraph 1; in other words, the substance is merely that the Circuit Court erred in reversing the decision of the Board. The importers assigned no errors, and took out no writ of error. Therefore, we have no call in their behalf to consider whether, as between paragraph 20 and paragraph 22, the opinion of the learned judge of the Circuit Court would have been prejudicial to them if carried into the decree. On the whole, we conclude that, as we are not called on to go beyond the consideration of the final decree in its formal shape, it would be unwise and unsafe for us to attempt to review all the questions of law and fact involved in the decision of the Board of General Appraisers. Therefore, aside from certain incidental observations which we cannot well avoid, the only question we pass on is whether the importations were properly classified under paragraph 1.

Aside from the fact or suggestion that a chemical was added for the mere purpose of preventing the extract from moulding, which, as stated by the Board of General Appraisers, apparently not disputed, worked no chemical change, so that it is not material in this case according to our opinion in Brennan v. United States (C. C. A.) 136 Fed. 743, 747, 748, passed down on April 12, 1905, the importations were described by the board as a simple product of powdered nutgalls and water "filtrate." By this word "filtrate" we suppose the board intended that the liqueous mixture had been filtered. Certainly, the record shows that the importations were merely a mixture of ground or powdered nutgalls and water which had been, as we say filtered. The learned judge of the Circuit Court found this filtrate contained about 25 per cent. of tanning matter (tannic acid chiefly), more than 50 per cent. water, volatile matter, and a large organic mineral residue.

Nutgalls are a morbid growth on the surface of the oak, and contain, of course, a considerable percentage of the elements of tannin, or tannic acid, as does the bark of that tree. They subserve no use other than as a basis for the manufacture of extract of nutgalls, and as a further resultant of tannic acid. The various resultants of nutgalls

are used for tanning leather, dyeing, and mordanting, and also for calico printing; in other words, for all purposes for which "extracts and decoctions of logwood and other dyewoods and extracts of barks" named in paragraph 22 are commonly used. As said by the Board of General Appraisers, tannic acid may be produced from the extract of nutgalls. as follows:

"The extract is decanted or filtered, and acetate of lead added to the filtrate. The lead from the acetate of lead combines with the tannic acid to form tannate of lead, which is precipitated. The acetic acid from the acetate of lead is left in solution with impurities from the nutgalls, and is poured off. The precipitated tannate of lead, which is insoluble in water, is suspended in water by agitation, and hydrogen sulphide, or some substance which will combine chemically with lead, is passed through it. The sulphur of the hydrogen sulphide combines with the tannate of lead, and forms a precipitate of lead sulphide, setting free tannic acid, which immediately dissolves in water. The solution of tannic acid is then poured off and boiled down, leaving the tannic acid in the form of a powder. It is admitted on all sides that the powder obtained by the above process is commercially tannic acid, and is the chemical product known as such."

The record shows that there are other processes of producing tannic acid from extract of nutgalls. Some methods are said to be still secret, but all known involve several steps and several chemical reactions. The Board concludes: "It is thus clear that extract of nutgalls, when considered chemically, is not tannic acid."

Under paragraph 548 of the act of July 24, 1897 (chapter 11, § 1,. Schedule A, 30 Stat. 197 [U. S. Comp. St. 1901, p. 1683]), crude nutgalls are expressly put on the free list. Mr. Rau, an eminently intelligent witness for the United States, engaged commercially in manufacturing and dealing in tannic acid, as well as to a certain extent educated in chemistry, speaking of the very meager cost of producing extract of nutgalls, testified:

"There is so little labor connected with the mixing of nutgalls with water in the whole or crushed state that it would naturally be done in this country, as water and nutgalls are both free."

In reply to an inquiry about the cost of grinding nutgalls and mixing with water, he said: "The cost on this side to a manufacturer regularly engaged in the business is probably merely nominal." Rau makes the price of the technical tannic acids, such as he says are used in dyeing, tanning, calico printing, and the weighting of silk, from 30 to 40 cents a pound, with special kinds running to, perhaps, 60 cents. Liquid tannin is spoken of in the testimony, but the parties have not very clearly explained what it means. It is apparently a dilution of tannic acid or tannin. It certainly is not extract of nutgalls, because extract of nutgalls contains many ingredients which liquid tannin does not contain, and cannot contain. Liquid tannin is said to sell at from 12 to 20 cents per pound, according to its density. On the other hand, the only direct evidence in the record as to the marketable value of extract of nutgalls is that the very merchandise in dispute here was sold to the calico printing trade at 16½ cents per pound in 1900, but in 1902 the extract was selling at 9½ cents per pound.

The importers computed that this particular merchandise cost them from 12½ to 13 cents per pound delivered, so that the duty claimed

by the United States of 50 cents per pound would be substantially equivalent to 400 per cent. ad valorem. In view of the facts we have stated, to advance nutgalls to be classified as claimed by the United States, when merely ground and mixed with water at a nominal expense, would be a tremendous leap, such as could hardly be expected to be within the intention of Congress. We cannot suppose, in the absence of forcible facts, deducible from the federal legislation or from the proofs in the record, both of which are absent, that Congress had any such intention.

We are unable to perceive any natural similitude whatever in the direction claimed by the United States; that is, between extract of nutgalls and tannin or tannic acid. It is true that one of the component parts of the extract of nutgalls is tannin, and this probably not in chemical combination, but only as a component; but, in order to obtain from that extract the tannic acid of commerce, or tannic acid as it is chemically known, a long series of chemical combinations and precipitations, such as we have described, is necessary. It may be dangerous to attempt to illustrate this proposition by specific analogies. It is perhaps mainly a matter of common sense perception. Although the tannic acid sought as the result of such processes are the Board of Appraisers described exists in combination in the original mixture, yet that result is, for practical purposes, and, alike in popular and commercial phraseology, a new thing. For illustration, steam, or the vapor resulting from steam, is only water evaporated or sublimated; and yet neither in popular phraseology nor by the law of the courts is either regarded as water. So alumina is the characterizing ingredient of common clay, and yet in no fair sense of the English language are they the same, either actually or by similitude, although by an expensive process alumina and its metal, aluminum, are derivable from the clay. Indeed, we may go further, and say that the United States answer their own proposition on this particular. In speaking of the alleged similitude to "nutgalls advanced in value," the Board of General Appraisers said that it must be borne in mind that "nutgalls extract has entirely lost its character as nutgall." So at bar, referring to the alleged similitude to "nutgalls advanced in value," the United States urge that, if the position of the Circuit Court is correct in that particular, the provisions of the tariff acts in reference to berries could be applied to all sorts of fluids made from berries in combination with other articles. and those for fruits to all sorts of preparations made from fruits, and, likewise, the provisions for flowers, leaves, herbs, grains, vegetables, and aromatic seeds. Here are, in effect, clear statements that, by the mere changes to which they have referred, from nutgalls, berries, and the like, the originals have entirely lost their character as such. All this illustrates perfectly the proposition which we make that, by the change, involving various processes, from extract of nutgalls to tannic acid, the original extract of nutgalls has also, in every proper sense, entirely lost its character as such. Indeed, as between extract of nutgalls and tannic acid, in view of the explanations we have made, it violates every sensible rule of the use of the English language, and speaks only with refined ingenuity, to assert similitude on account of

some similarities "in material, quality, texture, or use," as spoken of by section 7 of the act of July 24, 1897 (chapter 11, 30 Stat. 205 [U. S. Comp. St. 1901, p. 1693]). By necessary implication, as well as by the force of the lines of decisions of the Supreme Court, customs legislation speaks in a natural voice to the persons or classes to whom it is addressed, according as those persons or classes are laymen, merchants, or men of science; and the attempt here to classify the mere filtrate of nutgalls as tannic acid or tannin is only one of the too numerous instances in which either the United States or importers undertake to twist what is plainly written, contrary to this rule of construction, for the purpose of obtaining special results, in the interest of one or the other. Therefore, we are compelled to reject the claim of the United States that the importations in question on this appeal should be classed as tannin or tannic acid by either direction or by similitude.

The result we reach is supported by the uniform, practical, departmental construction given the customs legislation for many years. There is a long and well-known series of decisions by the Supreme Court, holding that a settled practice of the Treasury Department under the circumstances before us, where originally there might have been a doubt, affords a rule of statutory construction of the highest authority. This applies, also, to some extent, to the construction of other statutes, and is not even limited to domestic statutes. We have no occasion to go through this line of decisions, because we have lately sufficiently referred to them in United States v. Swift (C. C. A.) 139 Fed. 225, 230, decided on June 15, 1905, and especially in Brennan v. United States (C. C. A.) 136 Fed. 743, 749, decided on April 12, 1905, and directly applicable to cases of the class of this appeal. We may, however, refer to the latest statement of the general rule with reference to one of its limitations in Hackfeld v. United States, 197 U. S. 442, 451, 25 Sup. Ct. 456, 49 L. Ed. 826.

Not only the true force of this rule, but especially the necessity of abiding by it in order to prevent injustice, are exhibited in the present case in a marked manner. We will see as we go along that never in the history of the importations of merchandise of the class in question, until the letter of the acting Secretary of the Treasury to the collector of customs at New York of October 9, 1900 (T. D. 22,529), vol. 3, p. 831, was it ever held that extract of nutgalls should be classified, either by direction or by similitude, with tannin or tannic acid. On June 11, 1900 (T. D. 22,278, G. A. 4,716), vol. 3, p. 504, a decision of the Board of General Appraisers classified importations of the class in question here as was done in the opinion of the learned judge of the Circuit Court in this case. The first of the importations before us was entered on October 10, 1900, the next day after the letter of the acting Secretary of October 9, 1900, and the remainder between that date and November 27th. Consequently, it is apparent that the importers purchased and imported this merchandise relying upon the practice of the Treasury Department, which we will explain, thus making probable a safe business venture; but, by the letter of October 9, 1900, supported by the ruling of the Board of General Appraisers, the United States seek, not only to confiscate under the form of duties the entire im-

portation in question, but to add thereto the loss of 200 or 300 per cent. Extract of nutgalls does not appear to have ever been expressly named in any customs statute. Tannin or tannic acid seems to have been first assessed specifically in the act of July 29, 1846, and from that time until the present one or both have appeared in every succeeding statute. This is made clear by the valuable Congressional publication, Tariff Compilation, 1891, 51st Cong. (2d Sess.) Senate Report, 2,130. Never from 1846 until the letter of October 9, 1900, was any attempt ever made to classify extract of nutgalls as either tannin or tannic acid. The result of the various rulings will be found in Heyl's United States Import Duties (1874), a very careful compilation, in Adams' New United States Tariff (2d Ed., 1890), and in Morgan's Digest (1895), also a work which, in its various editions, has been marked by extraordinary accuracy. We cite these manuals because, on account of their differing dates, they epitomize a continuous line of decisions. None of them exhibits any suggestion of a classification of extract of nutgalls as tannin or tannic acid.

The first ruling of the Department brought to our attention as having any relation to this question, although only an indirect one, is the letter from J. F. Hartley, Assitant Secretary of the Treasury, to the collector at Boston, of February 4, 1875 (2,095), Synopsis of Decisions, Treasury Department (1875), 22, relating to extract of sumac. It appeared that the importers claimed that the article was free of duty as an "extract of dyewoods." On the ground that the small amount of woody fibre in sumac did not warrant the importers' claim, the collector was directed to assess duty at 20 per cent. ad valorem, being at that time the rate for manufactured goods not enumerated. This was stated to have been an affirmation of the ruling of the Department of November 2, 1874. This stood until the letter of H. F. French, Assistant Secretary of the Treasury, to the collector at New York, of January 18, 1877 (3,079), Synopsis of Decisions, Treasury Department (1877), 23. Therein, with reference to the extract of Persian berries, as to which the importers claimed a similitude to extracts of dyewoods, it was ruled that, in accordance with the letter of February 4, 1875, this importation, also, was liable to 20 per cent. duty as a nonenumerated article. The letter observed that, as the extract was obtained from berries, it could not be assimilated to extracts from plants and woods. Then came the letter of April 26, 1878, from H. F. French, Assistant Secretary, to the collector of customs at New York (3,553), Synopsis of Decisions, Treasury Department (1878), 472, assessing the duty on extract of nutgalls at 20 per cent. ad valorem, still on the ground that it was a manufactured article not otherwise provided for.

The next was a letter from the same Assistant Secretary, H. F. French, to the collector at New York, dated on January 11, 1879 (1,384), Synopsis of Decisions, Treasury Department (1879), 11. This acquiesced in a decision of the United States Circuit Court for the Southern District of New York, which held that extract of sumac was extensively used for tanning and dyeing purposes, and, "like extract of dyewoods, valuable for dyeing purposes on account of its mordant

properties." Also, it pointed out further details establishing a similitude between extract of sumac and "extracts and decoctions of logwood and other dyewoods." The latter were specifically provided for in the then existing tariff, but extract of sumac was not. The letter thereupon accepted the similitude claimed by the importers, and, as held by the court, to extracts and decoctions of logwood and other dyewoods. We refer to this decision merely because it bears on the next one, which is directly pertinent to this appeal.

On March 5, 1879 (3,898), Synopsis of Decisions, Treasury Department (1879), 58, Mr. French wrote again to the collector of customs at New York a letter relating expressly to extract of nutgalls and some other matters not of importance here. He referred to the letter of January 11, 1879, and reaffirmed it as bearing on the similitude between extract of sumac and extract of logwood and other dyewoods, and directs a classification of extract of nutgalls in favor of the importer, as the letter shows, "by reason of the similarity which exists between such extract and the extract of dyewoods." It should be noted that this letter is carefully reasoned out, and it shows that its conclusions were reached with due consideration. It is also to be noted that the Department in 1874 and 1875 had classified all these importations as subject to a rate of 20 per cent. ad valorem as nonenumerated articles, and that the only variation in its rulings was that, pursuant to the decision of the Circuit Court, it concluded to accept, without appeal to the Supreme Court, the similitude to extracts of dyewoods, with a duty of 10 per cent. ad valorem. Nowhere did any one maintain that there was any similitude with tannic acid or tannin, both of which, as we have shown, were specifically provided for by the existing customs acts. The letter of March 5, 1879, refers to the fact that it would be "extremely doubtful" whether the United States would be successful if it should appeal; thus admitting that this is of the class of cases to which the practical construction by the Department has very pertinent reference.

The result of these decisions was to establish a similitude between extract of nutgalls and extracts of dyewoods, which latter were, as we have said, then specifically provided for, and which still remain provided for specifically in paragraph 22 of the statute before us. Act July 24, 1897, c. 11, § 1, Schedule A, 30 Stat. 152 [U. S. Comp. St. 1901, p. 1628]. The fact that extract of sumac has since been specifically provided for does not affect the application of these decisions, because, as we have said, the similitude established by them was to extracts of dyewoods, and extract of sumac was only indirectly referred to so far as extract of nutgalls is concerned.

On January 12, 1883 (5,529), Synopsis of Decisions, Treasury Department (1883), 23, Mr. French again, in a letter to the collector at Boston, referred to a question arising as to extract of myrobalans, and affirmed and applied the ruling of March 5, 1879, on the express basis that the article then in question was used by tanners and dyers on account of the tannic acid it contained, and that it was similar in its character, and uses to which applied, to the extracts of nutgalls, Persian berries and sumac. It appears from the letter of W. B. Howell, As-

sistant Secretary of the Treasury, to the collector at New York of March 7, 1898 (19,052), Synopsis of Decisions, Treasury Department (1898), vol. 1, p. 365, that the classification of extract of nutgalls, according to the ruling of March 5, 1879 (3,898), had been followed by the Department until that time. It further appears that the appraiser at New York at that time expressed the opinion that the extract was a nonenumerated manufactured article, and dutiable at the rate of 20 per cent. ad valorem, and that it did not assimilate to dyewood extracts. This arose under the act of 1897. The Assistant Secretary expressed no opinion on the matter, but simply directed that the extract should be classified accordingly, "leaving the importers to their remedy by protest." There had appeared in the act of 1883 (Act March 3, 1883, c. 121, 22 Stat. 488 [U. S. Comp. St. 1901, p. 2247]) a provision for "nutgalls" "advanced," which disappeared in the act of 1894 (Act Aug. 27, 1894, c. 349, 28 Stat. 509), but which now appears in paragraph 20 (30 Stat. 152 [U. S. Comp. St. 1901, p. 1628]), as we have fully explained. This made no change in the practical construction of the statute until the letter of March 7, 1898, and the decision of the Board of General Appraisers of July 11, 1900 (22,278, G. A. 4,716), Treasury Decisions, vol. 3, 504, where it was ruled that extract of nutgalls was to be classified as excrescences or nutgalls advanced, either by direction or under the similitude clause.

Meanwhile, there came the decision of the Board of General Appraisers of July 3, 1896 (17,354, G. A. 3,574), Synopsis of Decisions, Treasury Department (1896), 633, to the effect that a certain importation known as "Keller's Tannin Powder" was dutiable as tannin or tannic acid. The decision remarked that tannin and tannic acid may be regarded as synonymous terms. This was shown to be a powder produced from nutgalls, and the Board observed that it was conceded "to be something more than nutgalls simply powdered, which, as it said, would contain woody fibre and other matter insoluble either in alcohol or water." It was stated that the importation contained 85.30 per cent. tannic acid, more than three times as much as extract of nutgalls. It was also said that, being imported and sold by only one importer, it had no general commercial designation. The Board thought it was tannin, and assessable as such, and this without any reliance on the similitude clause. It seems to have been supposed that this reversed the former rulings which we have cited, but there is no indication of any such intention. The former rulings were not even referred to, and the decision of the Board of General Appraisers of June 11, 1900, made no reference to this decision of July 3, 1896, but continued to refuse to classify extract of nutgalls as tannin or tannic acid. Indeed, it went so far in this direction as to close its last opinion with the following positive phraseology:

"We deem it advisable to admonish classifying officers to exercise great care in order that this article, nutgall extract, shall not be confounded with concentrated solution of tannin or tannic acid."

Pending all these decisions, there had been no change in the statutes which could affect the present claim of the United States that the importations to which this appeal relates should be classified as tannin

or tannic acid, either by direction or similitude. The specification of "nutgalls advanced," etc., so far from strengthening the case in favor of a classification as tannic acid or tannin, only weakened it by adding to the range of possible similitudes. Thus, by an unbroken practice of 26 years, from 1874 to 1900, with customs acts always specifically providing for tannin and tannic acid, and none specially providing for extract of nutgalls, the rulings of the Department, so far as any supposed similitude between these two kinds of importations is concerned, were firmly consistent in rejecting it, and were intensified at the last by the cautionary observation which we have already quoted from the Board of General Appraisers of June 11, 1900. That they were firmly consistent against classifying as tannin or tannic acid is all that is required for this case, although they fluctuated in other directions.

This consistency of rulings continued until October 9, 1900, after, as we have said, the present importers, undoubtedly relying on the previous classifications, ordered the merchandise in question, when the Treasury addressed the letter to the collector at New York already explained, directing the assessment of 50 cents per pound. We are of the opinion, therefore, that the views which we have expressed, covering the natural and sensible reading of the statute, find reliable support in the long-continued practical construction given similar phraseology in previous acts, and to the present statutes until October, 1900; and we may go further, and add that this practical construction has been accepted by Congress, and re-enacted into law in the tariff acts of March 3, 1883 (chapter 121, 22 Stat. 488 [U. S. Comp. St. 1901, p. 2247]), October 1, 1890 (chapter 1244, 26 Stat. 567), August 27, 1894, (chapter 349, 28 Stat. 509), and July 24, 1897 (chapter 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]).

The tariff legislation re-enacted in the Revised Statutes conceived that there was a distinction between tannic acid as such and tannin as such. We have not been advised on what theory this distinction was made. However, the conditions at the dates involved in this appeal, as said in the decision of the Board of General Appraisers with reference to Keller's Tannin Powder, which we have cited, were such that tannin and tannic acid must be regarded as synonymous terms. The only possible question on that point which can arise in this case comes from the fact that the record speaks of liquid tannin, which we have already referred to, without clearly showing what it is. Buhl, a witness called by the United States, testified that his partnership made tannic acid in the form of powder and also in liquid form. He added, what bears on another part of the case, that there is no difference between extract of nutgalls and the liquid tannic acid "except in name." But names, it is always conceded, are important under customs statutes; and, moreover, as was well said by a witness for the importers, tannin and tannic acid can be produced from extract of nutgalls, but extract of nutgalls cannot be produced from either tannin or tannic acid. Therefore, they are in no way convertible terms. Rau, a witness for the United States, whom we have already referred to, testified that "the word, 'tannin' as used in commerce is identical with the words 'tannic acid' as used in commerce." Therefore, all our discussion with regard

to the claimed classification with tannic acid applies also to the word "tannin" found in paragraph 1 of the act of 1897 (chapter 11, § 1, Schedule A, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]).

Only one topic remains to be considered. The United States maintain that, under the circumstances, the findings of the Board of General Appraisers are, on matters of fact, not reviewable by us; and they cite a number of decisions which they say sustain their proposition that such findings are not to be disturbed where there is any evidence to sustain them. It is not necessary to discuss in detail the decisions cited. So far as we have examined them, they fail to support the United States on this proposition; and, while we are constantly administering this law, we have never been aware that we were bound by any such rule. Section 15 of the customs administrative act of 1890, (chapter 407, 26 Stat. 138 [U. S. Comp. St. 1901, p. 1933]) expressly provides that the Circuit Court shall review the questions of law and fact involved in any decision of the Board of General Appraisers with reference to which application is made to it. The rule, as now expressed by the Supreme Court, is that, where there have been decisions by two tribunals below, as to which it classifies masters in chancery and other like representatives of the courts as standing for one tribunal, the result should have especial weight on appeal; but here we have an entirely different condition—a decision of the Board of General Appraisers in favor of the United States and a decision of the Circuit Court against them.

As we have already said, we have no occasion to determine any proposition except that expressed in the final decree—that the decision of the Board of General Appraisers assessing duty at 50 per cent. on the imports in question should be reversed. Therefore, we have no occasion to determine the proper rate of duty to be assessed; and we are not bound by any incidental expressions in reference thereto which may have occurred in this opinion. Especially we guard ourselves from any implication in connection with the protests of the importers, which, as we have said, contain a number of alternative propositions as to classification, to the effect that the United States may or may not elect out of the same such classification as they deem most favorable, and thus finally avoid any determination herein which would bind the court as to any future importation.

The judgment of the Circuit Court is affirmed.