BURDITT & WILLIAMS CO. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. April 9, 1907.

No. 678.

**1. CUSTOMS DUTIES—CONSTRUCTION OF STATUTE—DOUBLE DUTIES.**

The schedules of the tariff acts of 1890 and 1897 are based on the principle of protection to American industry, and in the construction of their provisions no inference can be drawn against a particular construction, because it will result in imposing double or treble duties on an article by adding duties for each stage it is advanced in manufacture.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs Duties, § 10.]

**2. SAME—CONSTRUCTION BY TREASURY DEPARTMENT.**

The rule applied that a uniform construction given to a provision of a tariff schedule by the Treasury Department through a number of years, during which importations are made in reliance thereon, will not be overruled by the courts, except for cogent reasons.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs Duties, § 10.]

**3. SAME—CLASSIFICATION—ARTICLES MADE FROM COATED STEEL WIRE.**

Tariff Act July 24, 1897, c. 11, § 1, Schedule C, par. 137, 30 Stat. 161 [U. S. Comp. St. 1901, p. 1639], imposes a duty on steel wire smaller than No. 16 wire gauge of 2 cents per pound, with an additional duty of 1¼ cents per pound on articles manufactured from such wire, "and on iron or steel wire coated with zinc, tin, or any other metal two-tenths of 1 cent per pound in addition to the duty imposed on the wire from which it is made." In 1900 the Treasury Department ruled that articles manufactured from steel wire coated were subject to all three of such duties, but shortly thereafter, and in the same year, formally reversed such ruling, and has since uniformly ruled that the additional duty of two-tenths of 1 cent was not to be imposed on articles manufactured from coated steel wire. *Held,* that in view of the uncertainty of the language of the statute such uniform ruling by the executive department, continued for five years, would be treated as a practical construction of the act, and would not be reversed by the courts.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 147 Fed. 892.

Charles S. Hamlin, for appellants.

William H. Garland, Asst. U. S. Atty. (Asa P. French, U. S. Atty., on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This case arises on the construction of paragraph 137 of the customs act of 1897 (Act July 24, 1897, c. 11, § 1, Schedule C, par. 137, 30 Stat. 161 [U. S. Comp. St. 1901, p. 1639]), as follows:

"137. Round iron or steel wire, not smaller than number thirteen wire gauge, one and one-fourth cents per pound; smaller than number thirteen and not smaller than number sixteen wire gauge, one and one-half cents per pound; smaller than number sixteen wire gauge, two cents per pound: Provided, that all the foregoing valued at more than four cents per pound shall pay forty per centum ad valorem. Iron or steel or other wire not specially provided for

in this act, including such as is commonly known as hat wire, or bonnet wire, crinoline wire, corset wire, needle wire, piano wire, clock wire, and watch wire, whether flat or otherwise, and corset clasps, corset steels and dress steels, and sheet steel in strips, twenty-five one-thousandths of an inch thick or thinner, any of the foregoing, whether uncovered or covered with cotton, silk, metal, or other material, valued at more than four cents per pound, forty-five per centum ad valorem: Provided, that articles manufactured from iron, steel, brass, or copper wire, shall pay the rate of duty imposed upon the wire used in the manufacture of such articles, and in addition thereto one and one-fourth cents per pound, except that wire rope and wire strand shall pay the maximum rate of duty which would be imposed upon any wire used in the manufacture thereof, and in addition thereto one cent per pound; and on iron or steel wire coated with zinc, tin, or any other metal, two-tenths of one cent per pound in addition to the rate imposed on the wire from which it is made."

The importations consisted of rat traps, made of steel wire coated with copper. Some question arose at our bar whether the traps were made of coated wire, or whether the coating was done after the traps were put in shape, but the record shows that the former was the case. As said by the importer, practically the only question in the case is whether, on account of the wire being coated, the traps are subject to the additional duty of two-tenths of one cent per pound, stated in the concluding words of the paragraph in question. The ruling was against the importer, and thereupon it appealed to us.

In developing its position here, the importer says that the words "except that" in the proviso to which the imposition of two-tenths of one cent per pound is attached govern everything which follows them, leading to the result that "wire coated" is itself a manufacture of wire, so that the rat traps in question and coated wire are each of them manufactures especially and alternately provided for. The importer also claims that, on the ruling of the Circuit Court, a double duty is imposed, which, of course, is the fact. On the other hand, the United States makes no definite proposition beyond maintaining in general terms the result reached by the Circuit Court, except only that they rely upon Salt v. United States (C. C.) 127 Fed. 890, affirmed by the Circuit Court of Appeals in 134 Fed. 1021, 58 C. C. A. 442; and except, also, that they make some reference to "component material of chief value," which is inapplicable under the act of 1897. Salt v. United States is, also, to some extent relied on by the importer; but it affords no assistance to us because it arose from importations of manufactures of copper wire. Although copper wire and iron and steel wire are all covered by paragraph 137, yet the methods by which each is treated are so essentially different that we need make no further observation in reference to the decision thus cited pro and con.

The reliance which the importer places on the words "except that," to which we have referred, is not supported by any plausible reason therefor drawn from the context. It would have support if coated wire could be regarded a manufacture of wire, so as to be, as further suggested by the importer, an alternative for other manufactures of wire; but we will see that that proposition cannot be sustained. In no other aspect could these words relieve the particular portion of paragraph 137 in issue from the difficulties which present themselves. The words "and on" would still remain undisposed of, indicating that that portion is dislocated.

Although the objection by the importer on the point of double duty was given some weight by the Treasury in decision (22,474), hereafter cited, it is clearly of no assistance. There is a double duty on any construction of the statute, and the question is not one of double, but of treble, duty. However this may be, under the protective systems involved in the statutes of 1890 and 1897, duties specific and ad valorem were piled on each other so often that no particular inference can be drawn from any suggestion as to double duties or treble duties as applied to the case at bar. So, also, the claim by the importer that iron and steel wire coated is a manufacture of wire, and therefore is to be classed with other manufactures of wire, it is plain cannot be maintained. In support of this position, the importer cites several decisions of the Treasury, all of which were prior to the statutes of 1890 and 1897, and were either so remote or coupled with such special circumstances that they are of no assistance whatever. Under the practical rules of construction of customs statutes, to which commercial designations have so much relation, the mind which is fairly experienced perceives at once that giving an ordinary coating to wire does not constitute a new manufacture within the ordinary commercial sense of the expression, or within the meaning of such statutes. This topic was extensively developed by us in United States v. Proctor, 145 Fed. 126, 131, 76 C. C. A. 96, where we pointed out that the extract of nutgalls, although in such advanced state that it contained all the elements of tannin or tannic acid, had not changed its nomenclature so as to be said to be advanced into a distinctly new thing, as water is advanced into steam, or clay into alumina and its metal aluminum. Hartranft v. Wiegmann, 121 U. S. 609, 615, 616, 7 Sup. Ct. 1240, 30 L. Ed. 1012; Tidewater Company v. United States, 171 U. S. 210, 216, 18 Sup. Ct. 837, 43 L. Ed. 139; Allen v. Smith, 173 U. S. 389, 399, 19 Sup. Ct. 446, 43 L. Ed. 741; and United States v. Dudley, 174 U. S. 670, 678, 19 Sup. Ct. 801, 43 L. Ed. 1129. There remains, nevertheless, to be considered the proposition made by the importer that, on a fair and natural reading of the proviso applicable here, the specific duty of two-tenths of one cent is not to be levied, except on wire which has been coated and which is imported as such. We will return to this later.

The Board of General Appraisers did not discuss the particular topic before us, and the reason therefor is apparent. The appraiser at the port of Boston, where the merchandise was entered, assessed a duty of 40 per cent. ad valorem, plus 1¼ cents per pound. Nothing was said by him about the two-tenths of one cent. The protests of the importer were against the 40 per cent.; and those parts of the protests which name the proper duty to be assessed contained several possibly lawful rates, among the rest that of 2 cents, plus 1¼ cents, plus two-tenths of one cent, the very duty which was held by the Circuit Court to be lawful. This latter suggested rate is what is spoken of by the Board of Appraisers as "(c)". The Board rejected the 40 per cent. ad valorem duty; and, without discussion as to it, it accepted (c) exactly as it stood in the protests, so that the importer is now protesting a rate of duty suggested by itself. This is, nevertheless, without objection on the part of the United States, so that it remains for us to determine what assessment is in fact in accordance with the statute.

By a decision of the Treasury of April 20, 1900 (22,168), it was held that heddles, tinned, carried the specific duties now under discussion of 1¼ cents per pound and two-tenths of one cent for the tinning. Subsequently, by its decision of September 7, 1900 (22,474), the Treasury formally reversed its decision of April 20th, and held that the additional duty of two-tenths of one cent per pound was not to be imposed upon heddles manufactured of wire tinned. The heddles stand exactly for the rat traps here under consideration; and the decision of the Treasury of September 7, 1900, is directly in point. We are informed that, until the protests in this case, which bear date respectively on September 20, 1905, and October 13, 1905, the importations of this importer were constantly assessed without the addition of the two-tenths of one cent per pound, and duties were paid accordingly. The record shows no trace of any assessment of this additional duty anywhere, or any claim by the Treasury for any such assessment, during the five years which thus intervened. So absolutely uniform was the practice that, in the case before us, the appraiser, as a matter of course, added only 1¼ cents to the 40 per cent. ad valorem, although, clearly, the additional duty of two-tenths of one cent must be added to the ad valorem duty on iron or steel wire if added to the specific duty. Therefore, we have here a formal ruling of the Treasury, supported by five years continuous, uniform, and universal practice, and this with reference to the construction and practical operation of a statute which certainly must be held in doubt, in view at least of the fact that the experts of the Treasury gave it two absolutely opposite constructions within a period of less than six months.

Aside from this decision of the Treasury of September 7, 1900, and the practice following it, the paragraph in question has no satisfactory history, and no prototype, except as we may hereafter explain. It shows a dislocated form of expression, in that it uses the words "and on," which have no proper relation to any phraseology which precedes them. This suggests that it came in by an amendment, the circumstances touching which have in no manner been explained to us. Therefore it is practically impossible to apply the more ordinary rules of construction, except, on the one hand, that, where a question of interpretation of a customs statute is doubtful, the doubt will be resolved in favor of the importer—a general rule constantly repeated—and, on the other hand, that, applying a particular exceptional rule as to the statutes of 1890 and 1897, we must regard the policy running through them to be one of protection to our manufactures. Arnold v. United States, 147 U. S. 494, 497, 13 Sup. Ct. 406, 37 L. Ed. 253. The most which can be said as to general rules of construction is that the phraseology here interposed by Congress cannot be rejected, and must be interpreted in some way.

The importer finds support for his view of this paragraph in that the words on which the United States rely close the paragraph, and, by their mechanical arrangement, come in after the entire question as to the duty on these importations has apparently been disposed of. Therefore the importer's general position which we have stated— that the closing words have nothing to do with these importations— is not without some plausibility. On the other hand, the peculiar

words "and on" show that they were accidentally located. This leaves a plain right to test the intention of Congress by experimentally locating them elsewhere. Relocating them, therefore, in some part of the paragraph before the proviso assessing the duty of $1\frac{1}{4}$ cents per pound on manufactures from wire, the whole has an orderly reading; and it would then naturally be conceded that the position of the United States at bar was correct.

The particular expression in question was undoubtedly brought from paragraph 148 of the customs act of 1890. (Act Oct. 1, 1890, c. 1244, § 1, Schedule C, 26 Stat. 577). This paragraph commences with imposing a duty upon wire made of iron or steel, thus generally like the opening portion of paragraph 127 in issue here. Then later, in paragraph 148, come these words: "There shall be paid on iron or steel wire coated with zinc or tin, or any other metal, * * * one-half of one cent per pound in addition to the rate imposed on the wire of which it is made." This is exactly the phraseology, mutatis mutandis, found in issue here, the words "there shall be paid" being omitted. This mutilation, and the consequent dislocation to which we have referred, establishing our proposition of coming in by an amendment, justify the experimental relocation which we have suggested. The act of 1890 contains no specific duty on articles manufactured from wire in the form found in paragraph 137 of the present statute; but it guards against the manufactured article paying less than the duty imposed upon the wire from which it is manufactured, or which forms a component part of chief value. Under that act the duty on traps like those imported in this case was assessed under the more general provisions of the law; and we are told that it was assessed accordingly at 45 per cent. ad valorem, which was probably sufficient to promote the purpose of Congress, which had in view in this legislation the protection of our industries.

However, we have the rule for the interpretation of these statutes of 1890 and 1897, already stated, that they are to be regarded as intended for the protection of domestic industries; and, in that light, and, in accordance with the customary methods, we should expect an additional duty for each marked stage in advance which involves any considerable amount of labor. One of these stages would be the making of the plain wire; the second, the coating; the third, the manufacture of the specific article from the coated wire; and we would be entitled to assume that the phraseology should be relocated so as to carry out the general purpose of this class of legislation. After all, the natural interpretation of the statute is that wire is wire whether coated or not, and that, when Congress declares that articles manufactured from iron or steel wire shall pay the rate of duty "imposed upon the wire used in the manufacture of such articles," besides some special additional duty, it intends to take wire in the form in which it is manufactured, whether coated or uncoated, so that the basis is what wire uncoated pays if wire not coated is used, or what wire coated pays if wire coated is used. Independently of the considerations which we will now state, this is the interpretation which, we think, belongs to this paragraph; but we cannot overlook the ruling of the Treasury of September 7, 1900, to which we have already re-

ferred, and the unbroken, continuous practice from that time until the present importations were made in the autumn of 1905, which practice was in accordance with the present contention of the importer.

We gave attention to the rule of construction growing out of settled practices of executive departments, a class which seems to have peculiarly just application to customs statutes, in United States v. Proctor, 145 Fed. 126, 132, 76 C. C. A. 96, by an opinion passed down on January 25, 1906. There the circumstances were such that there was no question about its application, and we referred to it in that case only in a general way, and only to some leading authorities. The case at bar, however, is closer, so that we need give the law in this particular a somewhat fuller exposition. By its decision of April 20, 1900, which was within three years from the time the act of 1897 went into effect, the Treasury ruled, as we have shown, in accordance with the present position of the United States. On further consideration, however, in September, 1900, the Department positively ruled in favor of the position taken before us by the importer; and the practice ever since has been in accordance with that revised ruling. Notwithstanding the Department first ruled as it did in April, it cannot be fairly said that the departmental practice has not been uniform; because the prompt revision of the ruling which the Department speedily found to be erroneous can hardly be regarded as creating the lack of such uniformity as the Supreme Court said in United States v. Healey, 160 U. S. 136, 145, 16 Sup. 247, 40 L. Ed. 369, is necessary in order to justify the application of the particular rule we are considering. It can hardly be said that, because at an early day the Treasury made a ruling which it immediately after corrected as erroneous, following ever since a practice in accordance with the correction, this amounts to a lack of uniformity in the proper sense of the expression.

Of course, the length of time over which the practice of the Department extended in this case is shorter than that which has usually accompanied the application of this special rule in the various cases reported; yet, in United States v. Alabama Railroad Company, 142 U. S. 615, 621, 12 Sup. Ct. 306, 35 L. Ed. 1134, the continuance of the practice was only a short time longer than in the case at bar. Nevertheless it was regarded as sufficient to justify the adoption by the court of the practical construction given there by the Postmaster General. The rule seems to be always applied where the statute is really doubtful, and where, also, the departmental construction was practically contemporaneous with its enactment, and continued a considerable length of time, with uniformity. The various elements named in this statement give way, more or less, according to all the circumstances of the case; so that, on the whole, the court may derive assistance from the construction given by the executive officers, though all these elements are not present to their full extent. It is often said in general terms as follows:

"The construction given to the statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons." United States v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588.

Such expressions as this show that the rule is not a stiff one, and that, as we have said, it has regard to all the circumstances. As to what is a sufficient doubt, Mr. Justice Miller, speaking in behalf of the court in Peabody v. Stark, 16 Wall. 240, 243, 21 L. Ed. 311, says:

"In the absence of a clear conviction on the part of the members of the court on either side of the proposition in which all can freely unite, we incline to adopt the uniform ruling of the office of the Internal Revenue Commissioner."

Returning again to United States v. Alabama Railroad Company, supra, at page 621 of 142 U. S., at page 308 of 12 Sup. Ct., 35 L. Ed. 1134, the opinion observes that the court will "look with disfavor upon any sudden change whereby parties who have contracted with the government upon the faith of such construction may be prejudiced." This has particular application to importers who purchase goods abroad, expecting to market them at home, on the faith of a continuous practice of the Treasury in administering the statutes. This was peculiarly illustrated in United States v. Proctor, supra, where it was shown that the contemplated change on the part of the United States relative to the rate of duty there involved would have resulted in a practical confiscation of importations, which the importer was justified by the preceding practice in assuming would yield a reasonable business profit. In the same direction the opinion passed down in behalf of the court in United States v. Finnell, 185 U. S. 236, 244, 22 Sup. Ct. 633, 636, 46 L. Ed. 890, said that, if a construction acted upon by accounting officers for many years should be overthrown, "we apprehend that much confusion might arise." This was followed by a repetition of what we have already cited from United States v. Alabama Railroad Co., that "the action during many years of the department charged with the execution of the statute should be respected, and not overruled except for cogent reasons."

Of course, we cannot hold that the United States is estopped by the conduct of its executive officers in the technical sense of that expression; but we are reminded in United States v. Finnell, just cited, at page 144 of 185 U. S., at page 636 of 22 Sup. Ct., 46 L. Ed. 890, that Congress can enact legislation to change any existing practice if it deems that course conducive to public interests. We are also reminded by what we have quoted from United States v. Alabama Railroad Company, at page 621 of 142 U. S., at page 308 of 12 Sup. Ct., 35 L. Ed. 1134, that the equities are such that, under all the circumstances, we should apply the particular rule of construction which we are discussing. Therefore we hold that the duty to be imposed is as now maintained by the importer—that is, the duty as assessed less two-tenths of one cent per pound, leaving a duty of 2 cents per pound plus $1\frac{1}{4}$ cents per pound—in accordance with paragraph 137 of the customs act of 1897.

The judgment of the Circuit Court is reversed, and the case is remanded to that court, with directions for further proceedings in accordance with our opinion passed down this day.