EAST ASIATIC CO.—NEW YORK AGENCY (INC.) *v*. UNITED STATES (No. 2016).[1]

TANNIC ACID—NUTGALL EXTRACT.

With the evidence establishing that commercial extract of nutgalls is a liquid containing 25 or 30 per cent of tannic acid, and that commercial tannic acid is a powder containing about 70 per cent, or even less, of tannic acid, a powder derived from the extract, containing more than 78 per cent of tannic acid, largely used in weighting silk fibers or fabrics, as a mordant in dyeing silk, and in the manufacture of ink, and not commonly used in tanning leather, is classifiable as tannic acid (par. 1, tariff act of 1913), and not as an extract or decoction of nutgalls (par. 30) or tanning material (par. 624).

United States Court of Customs Appeals, November 23, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8291 (T. D. 38151).

[Affirmed.]

*Sharretts, Coe & Hillis (Edward P. Sharretts* on the brief) for appellants.
*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument Nov. 4, 1920, by Mr. Sharretts and Mr. Lawrence.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise consists of 150 cases of a fine, light-brown powder which was imported into this country by the appellants from China. The invoice describes the article as "Gall-nut Extract," with the added statement that it "is powdered and nonalcoholic." It was so entered at the customs.

The appraiser reported upon the importation as follows:

The merchandise in question consists of so-called nutgall extract in powdered form. It contains about 70 per cent of tannic acid, while the commercial powdered nutgalls contain a lower percentage of tannic acid. It is used as a mordant in dyeing with aniline or alizarine dyes, in manufacture of ink, sizing silk, printing fabrics, tanning, etc. It was returned for duty as tannic acid at 5 cents per pound (par. 1, act of 1913).

Pursuant to the advisory return of the appraiser the merchandise was assessed for duty by the collector at the rate of 5 cents per pound under the classification of tannic acid in paragraph 1, tariff act of 1913.

The importers protested, claiming alternatively that the merchandise was either dutiable at three-eighths of 1 cent per pound under the provision for "extracts and decoctions of nutgalls" in paragraph 30, or was free of duty as a tanning material under paragraph 624 of the act.

---

[1] T. D. 38555 (38 Treas. Dec., 773).

The Board of General Appraisers heard the protest upon evidence and overruled it. From this decision the importers appeal.

Three paragraphs of the act of 1913 are thus brought into review, reading as follows, the first as far as applicable and the others in full:

1. Acids: * * * Tannic acid and tannin, 5 cents per pound; * * *

30. Extracts and decoctions of nutgalls, persian berries, sumac, logwood, and other dyewoods, and all extracts of vegetable origin suitable for dyeing, coloring, or staining, not specially provided for in this section; all the foregoing not containing alcohol and not medicinal, ⅜ of 1 cent per pound.

624. Tanning material: Extracts of quebracho, and of hemlock bark; extracts of oak and chestnut and other barks and woods other than dyewoods such as are commonly used for tanning not specially provided for in this section; nuts and nutgalls and woods used expressly for dyeing or tanning, whether or not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process; and articles in a crude state used in dyeing or tanning; all the foregoing not containing alcohol and not specially provided for in this section.

It may be repeated that the imported powder was assessed with duty at the rate of 5 cents per pound as tannic acid, whereas the importers claim it to be dutiable at three-eighths of 1 cent per pound as an extract of nutgalls, or alternatively that it is entitled to free entry as nutgalls used expressly for dyeing or tanning. In the brief of the importers, however, the claim for free entry is not relied upon; the issue, therefore, becomes a competition between the two enumerations, "tannic acid" and "extracts of nutgalls," in their application to the merchandise.

Upon this question the board held "on the trend of the whole evidence" before them, and "in the absence of direct testimony concerning the process of manufacture" of the article, that it should be classified as tannic acid, under paragraph 1, supra, and upon this finding the protest was overruled.

Ten witnesses in all testified before the board concerning the article in question, its origin, its composition, and the understanding and nomenclature of the trade with respect to it, and we think that their testimony when considered together fully sustains the decision of the board. And while it is neither necessary nor practicable for us to discuss the testimony in detail, we will nevertheless state in general terms what we regard as its clear force and effect.

The powder now in question is largely used in weighting silk fibers or fabrics, and as a mordant in dyeing silks; it is also used extensively in the manufacture of ink; it is not commonly used in tanning leather. It is derived from nutgalls. For the purposes of this case these may be described as morbid excrescences which are found upon certain kinds of oak trees in eastern countries. The buds or leaves of the trees are punctured by certain insects, which deposit their eggs therein; these are surrounded by a fluid which exudes from the tree; after a time the fluid dries, producing the nutlike growths

which are called indifferently nutgalls, gallnuts, or simply galls. These contain a very high percentage of tannic acid, otherwise called tannin, said indeed to be 75 per· cent of their substance, and this element constitutes not only their chief value, but in fact almost their sole value, in commerce.

The powder now in question was produced from such nutgalls in China, and there is no testimony in the record which specifically describes the processes pursued there in the operation. Similar nutgalls, however, are imported in large quantities in their crude state into this country, and local manufacturers extract from them their tannic-acid content. There is no evidence in the record to show that the operations undertaken in China for the recovery of tannic acid from nutgalls differs essentially from those pursued in this country for the same purpose.

In this process the nutgalls are first finely ground; then soaked in water.; after sufficient maceration the liquid is drawn off and filtered. The liquid is thereupon concentrated by evaporation of a part of its water content until it contains about 25 or 30 per cent of tannic acid in solution. The other components of the fluid are water and various elements, at present negligible, extracted from the galls. This seems to bring the first part of the operations in producing tannic acid to a close, and according to our appraisal of the evidence the liquid as it thus stands is the article known in commerce as "extract of nutgalls," and answers to that enumeration as it appears in paragraph 30, supra. It is needless to· say that the present merchandise is quite a different article, it being a powder containing slightly more than 78 per cent of tannic acid, which is derived from the foregoing extract by means of additional operations. And according to the clear weight of the evidence such powder when containing about 70 per cent of tannic acid or more is generally known in the trade in this country as commercial tannic acid, and the article retains this name in the markets even when the tannic-acid content is reduced to a lower percentage, as is sometimes the case, by means of adulteration. This conclusion is strongly supported by the fact, as established by the evidence, that in the markets of this country the substance which is commercially known as "tannic acid" invariably sells at a much higher price than does the substance which is known commercially as "extract of nutgalls;" and specific proof appears to the effect that this condition obtained prior to and during the year 1913.

There is a divergence in the testimony concerning the processes adopted in order to reduce the liquid extract above described as "extract of nutgalls" to the powder described as "tannic acid." Some witnesses say that this is accomplished by means of evaporation

with great care under a vacuum by the use of more or less secret forms of apparatus for control of the temperatures. By this means it is said the product comes to a dry form, and is ground and sold as tannic acid. Other witnesses, however, say that the reduction is accomplished by the use in part of ether, alcohol, acetone, or other solvents. We do not consider this difference as important, nor do we find anything in the present record to indicate that tannic acid is generally or invariably produced by means of chemical reactions only. In saying this we do not overlook the statement of the board to that effect in the present case, nor that of the court in the case of Procter & Co. v. United States (139 Fed., 586; affd. 145 Fed., 126). It may be noted, however, in passing, that the article which, in the decision of the court in the Procter case, was called an extract of nutgalls and held not to be tannic acid was not a powder containing 78 per cent of tannic acid as does the powder in the present case, but was a liquid containing only about 25 per cent of tannic acid. The following statement of the court in 139 Fed., 586, 590, may also be noted: "As above stated, however, it may be possible to make tannin from the powder without chemical reaction involving the tannin." The word "powder" as there used manifestly refers to nutgalls when reduced to powder by grinding. Of course in the present case all questions of fact must be decided upon the evidence contained in the present record, unless they be such as are within common knowledge; and we think that both the record and the standard authorities upon the question disclose the fact that mere physical agencies are often pursued in recovering tannic acid from nutgalls and that even when chemical solvents are employed their action is generally physical in character rather than in the nature of true chemical reactions. The reliance, therefore, which the appellants place upon the fact that the present article was not produced, so far as appears in the record, by means of chemical reaction does not seem to be justified.

Nor do we think that the importers' claim in this case is sustained by the principles which underlie the decision of the court in the case of Klipstein v. United States (4 Ct. Cust. Appls., 510; T. D. 33936). The merchandise in that case was assessed with duty as a coal-tar dye or color under paragraph 15 of the tariff act of 1909. It was claimed by the importers to be dutiable as an indigo extract or paste under paragraph 25 of the act. The court found that it was in fact an indigo paste which had been derived synthetically from coal tar, and therefore might also be described as a coal-tar dye or color. But the testimony in the present case clearly establishes the fact that the merchandise herein may not be described both as nutgall extract and tannic acid, but as tannic acid only. The decision in the former case, therefore, does not apply.

We may note that the case of Klipstein & Co., decided by the board in G. A. 4716 (T. D. 22278), and also the comments appearing in Notes on Tariff Revision, 1909, pages 10 and 34, should be read in connection with the Proctor cases (G. A. 5333 (T. D. 24395), 139 Fed., 586, and 145 Fed., 126, and the authorities therein exhaustively collected).

We agree with the board that upon the present record the protest should have been overruled, and the decision to that effect is therefore affirmed.

*Affirmed.*