KLIPSTEIN & Co. *v.* UNITED STATES (No. 1133).[1]

1. A BROMINATED DERIVATIVE OF INDIGO.

Sulphonated indigo and brominated indigo are alike pastes in point of consistency and are alike extracts of the same parent substance.

2. "INDIGO EXTRACTS OR PASTES."

These terms do not possess a definite, uniform, and general trade usage in this country such as would exclude the article here therefrom; nor has the article here itself been given by the trade a definite, uniform, and general title or designation such as to compel another classification. It was dutiable as an indigo extract or paste under paragraph 25, tariff act of 1909.

United States Court of Customs Appeals, November 28, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7432 (T. D. 33192).
[Reversed.]

*Brown & Gerry* for appellants.

*William L. Wemple*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise now before the court was assessed with duty at 30 per cent ad valorem as a coal-tar dye or color, under paragraph 15 of the tariff act of 1909.

The importers protested, claiming assessment of the merchandise at three-fourths of 1 cent per pound, as an indigo extract or paste, under paragraph 25 of the act.

The present record covers three distinct trials of this issue by the board, and contains the testimony taken at each of the three trials.

---

[1] Reported in T. D. 33936 (25 Treas. Dec., 553).

The decision at the first trial was reported as Abstract 26344 (T. D. 31832) and was favorable to the importers. That case was appealed to this court by the Government, but was dismissed upon appellant's motion without a hearing upon the merits. The decision at the second trial was reported as Abstract 28915 (T. D. 32645) and likewise was favorable to the importers. No appeal was taken from that decision. At the third trial, being the present one, the testimony taken at the preceding trials was incorporated in the record, and additional testimony was taken. The decision of the board at this trial was adverse to the importers and sustained the collector's assessment (T. D. 33192). From that decision the importers prosecute the present appeal.

The article in question is a color or dye derived by chemical reactions from coal tar. It is therefore dutiable as a coal-tar dye or color under paragraph 15, as assessed by the collector, unless the article is also an indigo extract or paste, in which event it would properly be dutiable as such under paragraph 25, as claimed by the importers. The real question in the case thus appears to be whether the article at bar is an indigo extract or paste within the provisions of paragraph 25.

The following paragraphs from the tariff revision of 1883 and those following are copied for reference:

1883.

Duty.

Indigo, extracts of, and carmined, ten per centum ad valorem.

Free list.

Indigo and artificial indigo.

1890.

Duty.

20. Indigo, extracts. or pastes of. three-fourths of one cent per pound; carmined, ten cents per pound.

Free list.

614. Indigo.

1894.

Free list.

514. Indigo, and extracts or pastes of, and carmines.

1897.

Duty.

25. Indigo, extracts, or pastes of, three-fourths of one cent per pound; carmined, ten cents per pound.

Free list.

580. Indigo.

1909.

Duty.

25. Indigo extracts or pastes, three-fourths of one cent per pound; indigo. carmined, ten cents per pound.

Free list.

592. Indigo.

From the earliest historical times indigo of vegetable origin has been a dyestuff of great commercial value and importance. About the year 1880 for the first time there appeared in trade an article having the same formula as vegetable indigo, which, however, was produced by chemical reactions from coal tar. This material is a dyestuff capable of the same use as vegetable indigo, and is called artificial or synthetic indigo. At the present time both vegetable and synthetic indigoes are largely dealt in, but the latter has come to be the more common and important article of the two.

Not long after the first production of synthetic indigo there appeared in trade an article produced by treating either vegetable or synthetic indigo with sulphuric acid, whereby certain hydrogen atoms in the indigo are replaced by atoms from the sulphuric acid radical. This article, sulphonated indigo, is useful in dyeing wool and silk, but commercially it will not dye cotton. It is usually marketed in suspension as a paste or semiliquid. About the year 1907 or 1908 a second indigo derivative, being the article now in question, first came upon the market. It is produced by the treatment of indigo with bromine, whereby certain atoms of hydrogen in the indigo are replaced by atoms of bromine. This article is brominated indigo, and is chemically known as an insoluble haloid compound of indigo. It is used in dyeing cotton, wool, or silk, and is usually marketed in the form of a paste or semiliquid. Both sulphonated and brominated indigoes are largely used as dyes in this country, the former upon animal fibers and the latter mostly upon cotton.

It seems clear that these two indigo derivatives may be produced from either vegetable or synthetic indigo, but practically synthetic indigo alone is used as a basis in their manufacture. This condition results, perhaps, from commercial considerations; but apart from that, vegetable indigo frequently carries impurities from which the synthetic article is free, making the latter a better basis for further chemical treatment.

As appears above, indigo itself was admitted free of duty by the tariff revision of 1883 and those following it. In the act of 1883 synthetic indigo was specifically included within the free-list provision under the name of " artificial indigo." In the subsequent revisions the free list simply names " indigo," but this *eo nomine* provision includes synthetic as well as vegetable indigo. (T. D. 20925.)

As is above stated, sulphonated indigo has been an article of trade in this country for the past 30 years. In the tariff act of 1883 there appears a provision for " extracts " of indigo; and in the following tariff acts there are provisions for " extracts or pastes " of indigo. During all the time covered by these enactments sulphonated indigo in suspension was a subject of importation, and was classified as

indigo extract or paste under these provisions. It is conceded that this classification is correct and should be followed. On the other hand, brominated indigo did not appear in this country until just before the tariff revision of 1909, and its dutiable status first became a sub-ject of litigation under that act. The practical question, therefore, now is whether the brominated derivative of indigo shall be classified, like the sulphonated derivative, as an indigo extract or paste, under paragraph 25 of the act of 1909.

At the present trial the board held that the brominated indigo now in question is not commonly or scientifically known as indigo paste. The board also found from the testimony that the term "indigo paste," appearing in the act, possessed a definite, uniform and general sig-nification in the commerce of this country which limited its applica-tion to sulphonated indigo alone. The board also found from the testimony that the present article—brominated indigo—is not uni-formly, generally, and definitely known in the trade and commerce of this country as indigo paste. The board therefore held that the present importations were not dutiable under the provisions for indigo extracts or pastes in paragraph 25, but were dutiable as coal-tar dyes or colors.

Upon a review of the record the court is unable to agree with the foregoing findings of the board. The testimony contained in the record is voluminous, and it is not necessary for the purposes of this decision to refer to the same in detail; the court will rather give the conclusions which it reaches upon the record. In doing this it seems proper to consider, first, the common or ordinary application of the words "indigo extracts or pastes," as used in the act; and to con-sider, second, whether those terms have acquired in this country a definite, uniform, and general commercial usage which excludes the importation therefrom; and to consider, third, whether the article in question has itself acquired in this country a definite, uniform, and general commercial title or designation which excludes it from clas-sification under the provisions for indigo extracts or pastes.

In respect to the first branch of this subject, it may be said that if the terms "indigo extracts or pastes" ordinarily include and apply to sulphonated indigo it is difficult to see how they can fail to in-clude and apply to brominated indigo likewise. The two substances are derived chemically from indigo by analogous processes. Both are dyestuffs, both produce "indigo-blue" colors, and both are usually marketed in the form of pastes. They bear a general re-semblance to the parent substance and to one another. It is true that sulphonated indigo will dye wool and silk and will not dye cotton, whereas brominated indigo will dye cotton as well as wool and silk. However, both vegetable and synthetic indigo will dye cotton, wool, and silk; therefore in this particular the brominated article resembles

the parent substance more nearly than does the sulphonated. It is also true that there are differences between the two articles in respect to the manner of their application in dyeing, the brightness of the shades of blue produced by them, the fastness of their respective colors, and their solubility or insolubility in water. These considerations, however, do not tend to exclude either article from the proposed classification without at the same time excluding the other. It seems certain that sulphonated indigo was first classified as an indigo extract or paste upon the theory that it was within the descriptive force and effect of those terms, and it may well be concluded that brominated indigo comes within the same description. The word " pastes," according to this construction, is simply descriptive of the physical consistency of the material as imported, and the word " extracts " relates to the derivation of the article from its parent substance, whose active principle it concentrates or preserves. These two qualities are the only ones which are required as conditions in the classification, and in respect to them the two articles in question stand upon precisely the same footing. They are alike pastes in point of consistency, and are alike extracts of the same parent substance.

Coming next to the question of the alleged commercial usage of the words " indigo extracts or pastes," it is apparent from the record that great weight must be given to the circumstances of the case.

It appears from the testimony that for 30 years sulphonated indigo alone was known in this country as indigo extract or paste; it even came to be known as *the* extract or paste of indigo; also as simply indigo extract or paste, but this fact obviously resulted from the circumstance that neither brominated indigo nor any other similar substance was imported at all during that period. Sulphonated indigo, in other words, was the only article which was classified under the terms in question, because it was the only article then appearing in trade which came within the common and ordinary signification of these terms. Therefore the long-continued application of the two terms to sulphonated indigo alone was not a peculiar trade usage of those terms; it simply indicated that sulphonated indigo was then the only subject of importation which came within the common meaning of the terms. This fact would not impair or limit the ordinary force of the terms as used in the acts, nor would it prevent their application in the usual and ordinary way to other articles possessing similar characteristics, if such articles should at any time be imported. Nor would it be necessary that a new article seeking classification thereunder should be exactly identical in all respects with the only article which already was conceded that classification. It would be sufficient if the new article possessed an essential resemblance to the former one in those particulars which the statute established as the criteria of the classification. In the present

case the sole condition is that the article in question should be an extract or paste of indigo within the ordinary meaning of those terms. Matheson *v.* United States (90 Fed., 276); Newman *v.* Arthur (109 U. S., 132); Pickhardt *v.* Merritt (132 U. S., 252); Cassett *v.* United States (2 Ct. Cust. Appls., 465; T. D. 32225).

Coming next to the question whether the present article has acquired in this country an individual trade title or designation which excludes it from classification as an " indigo extract or paste," the court again is led by the record to a negative conclusion. It appears, as above stated, that the present dyestuff was first placed upon the market in the latter part of 1907 or the early part of 1908. In either event it is probable that a substantial time would elapse before the trade in this country would give it a definite, uniform, and general title differing from the common or ordinary one based upon its palpable characteristics. It appears that the article was produced by the Chemische Industrie Basle Actiengesellshaft, the initial letters of which name, taken in their order, form the word " Ciba." The article was first invoiced by the importers under various names, such as " Ciba blue," " Ciba blue G paste," " Ciba blue G D paste," and other similar proprietary designations. In some of these the word " paste " appeared, in others not. The same may be said concerning the advertisements which were published by the importers in trade journals to promote the sale of the article. In the domestic market the article was sometimes sold as " indigo 2 B 20 per cent paste," " Brome indigo F B paste," or " indigo 2 B in paste."

It is stated by the importers that finally they invoiced the article simply as indigo paste. This they did in order to support their claim for the assessment of the importations under that description in parapraph 25 of the act of 1909. It appears, however, that the article is still sometimes ordered by customers under the " Ciba " names, notwithstanding the effort of the importers to prevent it. These statements apply alike to the brief period during which the article was imported under the tariff act of 1897 and also to its importation under the tariff act of 1909.

However, the court does not incline to the view that the distinctive titles thus given the article as above stated were effective to withdraw it from the more general classification of indigo extracts or pastes. It is common observation in trade that certain articles are advertised and marketed under fabricated names, which, indeed, sometimes become household words throughout the country, and that, nevertheless, the dutiable classification of the articles is not affected thereby. The tariff act does not deal with " Ciba blue " *eo nomine*, and the use of such a proprietary name in the markets would have no greater tendency to exclude the article from classification as indigo paste than from classification as a coal-tar dye or color.

Therefore, upon the entire record the court is satisfied that the present importation is an indigo extract or paste within the common meaning of those terms as they appear in paragraph 25; that those terms do not possess a definite, uniform, and general trade usage in this country such as would exclude the present article therefrom; and that the article itself has not been given by the trade a definite, uniform, and general title or designation such as would exclude it from classification thereunder. And in reaching this conclusion the court does not differ with the board concerning the weight of the evidence or the credibility of the witnesses, but rather concerning the legal effect of such facts as are practically undisputed in the record.

In addition to the foregoing views, it may be stated that the conclusion herein reached seems to be most consistent with the repeated use in the several tariff revisions of the plural words " indigo extracts or pastes," which imply the existence or possibility of plural articles of that description. It is also most consistent with the reasonable construction that Congress probably intended to cover the entire subject of indigo and its immediate derivatives by the *eo nomine* provisions appearing in the several acts for indigo, its extracts or pastes, and indigo carmined.

The decision of the board is therefore *reversed.*