UNITED STATES *v.* PAUL G. DOWNING ET AL. (No. 3091) [1]

United States Court of Customs Appeals, February 27, 1929

*Charles D. Lawrence*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States

*Allan R. Brown* for appellees.

*Marion De Vries* and *George Roscoe Davis* (*Jesse P. Crawford* of counsel), *amici curiae.*

---

[1] T. D. 43294

557

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and BARBER (retired), Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The importers made 144 entries of leather at the port of New York which were classified by the collector, variously, as calf, goat, and sheep leather, dressed and finished, other than shoe leather, under paragraph 1431 of the Tariff Act of 1922, which paragraph is as follows:

PAR. 1431. Chamois skins, pianoforte, pianoforte-action, player-piano-action leather, enameled upholstery leather, bag, strap, case, football, and glove leather, finished, in the white or in the crust, and seal, sheep, goat, and calf leather, dressed and finished, other than shoe leather, 20 per centum ad valorem.

The importers protested in each instance, claiming the leather to be free of duty under paragraph 1606 of said act, said paragraph being as follows:

PAR. 1606. Leather: All leather not specially provided for; harness, saddles, and saddlery, in sets or parts, except metal parts, finished or unfinished, and not specially provided for; leather cut into shoe uppers, vamps, soles, or other forms suitable for conversion into manufactured articles; and leather shoe laces, finished or unfinished.

The causes having been consolidated, the Customs Court sustained the protests and the Government appeals, insisting here that the classification made by the collector was right and should have been sustained.

On the trial in the court below a large number of samples of the imported merchandise were introduced. From these and from the testimony of the witnesses, it appears that the imported leathers are goat, kid, calf, and East India sheep skins. The East India sheep differ from the ordinary domestic sheep, being hybrids from sheep and goat stock. This leather is dressed and finished in many different ways and styles, ranging from plain gilt, silver, and colored surfaces to the most fanciful and intricate designs made with many colors, and many of which simulate skins of alligators, crocodiles, and other reptiles. Hundreds of such designs appear in the samples, and it appears from the testimony that the number of such designs which are, or may be, imported can be multiplied almost indefinitely.

Many witnesses were called and examined on both sides, and a voluminous record is the result. Space does not permit a detailed analysis of this testimony. It is conflicting in some particulars. However, after a careful study of it, we believe the weight of the testimony establishes these facts:

Prior to the enactment of the Tariff Act of 1922, a class of leather identical with that imported here was known to the leather trade of

the United States. Certain forms of it, notably plain-surfaced leather, gilt and silver kid, and imitation lizard and alligator leather made of calf and goat skins, were then imported and chiefly used for shoe purposes. This leather was usually chrome-tanned, and in a few instances was vegetable-tanned, but in all instances was subjected to a different kind of tannage than that used on leathers for other purposes. This particular method of tanning was used to give flexibility and endurance to the leather.

Shortly after the approval of the Tariff Act of 1922, there began to be a demand for other designs of this variety of leather. Thereupon, new designs were created and imported in ever increasing variety. Some of these new designs were those imported here. The leather was the same in tannage and suitability for use, but had, in most instances, a different finish and outward appearance. The plain-surfaced, gilt, silver, alligator, crocodile, and other reptile designs have continued in use. The record fairly shows that the chief use of such imported leathers, at the various times of importation involved here, was in the making of leather shoes.

Much testimony was offered by the Government and *amici curiae* in an attempt to establish certain facts, which it is claimed were material, to wit: That prior to and since the approval of the Tariff Act of 1922, all leather bearing such finish and ornamental designs was known to the trade as "fancy leather"; that such class included the articles of importation; that manufacturers in the United States produced, and importers imported, certain fancy leather which was chiefly used, at the times of importation of the leather in question, for purposes other than for leather boots and shoes; that the use of the major portion of all "fancy leather" used in the United States at the times of importation involved here was for other than shoe purposes. In substantiation of this last claim, the Government offered in evidence certain certified statistical information from a report of the Census Bureau of the Department of Commerce, admission of which was refused by the trial court.

The weight of the evidence is to the effect that the leather used by the said manufacturers for the making of bags and other than shoe purposes is not of the same tannage as the imported leather in the case at bar, is of an inferior quality and is not suitable for the making of leather boots or shoes.

As we have noted, there is some conflict in the testimony in some of these respects. However, the trial court, having heard the witnesses, has decided the facts adversely to the Government and we can find no error in its having done so, from this record.

This being the state of the facts, was there error of law in finding the goods to be free of duty under said paragraph 1606?

It is argued by the appellant that the dutiability of an article must be measured by its common or commercial designation, or its chief use, at the time of the approval of the Tariff Act involved; that these designs of fancy leather, not being used by the trade as shoe leather at the time of the approval of the Tariff Act of 1922, could not have been within the congressional intendment as shoe leather, but were intended to, and should, be classified as calf, goat, and sheep leather, dressed and finished. To support this position, *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932, is chiefly relied on. On the other hand, the importers argue that the chief use of such varieties of this leather as were used in 1922 was for shoes, and that, alternatively, even if the new designs in use since the approval of that act may be said to be new products, not theretofore known to the leather trade, they were, nevertheless, chiefly used at the times of importation for shoes and are therefore properly classifiable as shoe leather. The authority chiefly relied upon to support this contention is *United States* v. *Hudson Forwarding & Shipping Co.*, 14 Ct. Cust. Appls. 188, T. D. 41700.

In *Goldsmith's Sons* v. *United States, supra,* certain leather classified as football leather was before the court for consideration. The record disclosed that this leather, at the time of and prior to the approval of the Tariff Act of 1922, was commonly known and chiefly used as football leather. The importer introduced testimony to the effect that since the enactment of said tariff act he had used the imported leather exclusively for making basket balls. Such changed use, the importer contended, took the leather out of the classification of football leather and placed it in the the free list provision of paragraph 1606 as leather not specially provided for. We there held that the meaning to be given to the term "football leather" was the meaning which it had at the time of the enactment of the act and that the classification of an article known to the trade and classifiable as football leather at the time of the enactment of the Tariff Act of 1922 could not be changed by a subsequent different use or even a different name, in default of legislative changes.

This position was sound and based on ample authority. In *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 364, T. D. 40520, certain material claimed by the importers to be ferromanganese was under consideration under the act of October 3, 1913. The importers claimed that although their product was not ferromanganese as it was commercially known at the time of the approval of the act, since that time a lowering of the standards by which such product is measured had resulted in the imported material being known as ferromanganese. We there said, in connection with the citation of several authorities, that the meaning to be given the term "ferromanganese"

as it appeared in said Tariff Act was the commercial meaning which the term had at the time the act became effective. We further said:

This rule, of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. As to all such articles the statute will be held to apply if the articles possess an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.—*Klipstein* v. *United States,* 4 Ct. Cust. Appls. 510 [514]; T. D. 33936.

What we thus said in the *Smillie* case, *supra,* is supported by a long line of authoritative decisions in addition to those therein cited. *United States* v. *200 Chests of Tea,* 9 Wheat. 428; *Curtis* v. *Martin,* 3 How. 105; *American Net & Twine Co.* v. *Worthington,* 141 U. S, 468; *Roosevelt* v. *Maxwell,* 20 Fed. Cas. 1155; *Arthur* v. *Cumming, et al.,* 91 U. S. 362; *Newman* v. *Arthur,* 109 U. S. 132; *Pickhardt* v. *Merritt,* 132 U. S. 252; *Rossman* v. *Hedden,* 145 U. S. 561; *Auffmordt & Co.* v. *United States,* 7 Ct. Cust. Appls. 56, T. D. 36320.

Upon examination of the record in the latter case, it will be found that there is no conflict between *Goldsmith's Sons* v. *United States, supra,* and *United States* v. *Hudson Forwarding & Shipping Co., supra.* In the latter case, arising under the Tariff Act of 1922, certain alum-tanned leather had been generally used for shoe leather prior to 1880, but for many years thereafter and prior to the enactment of the Tariff Act of 1922, had been displaced as an outside shoe leather by chrome-tanned, and, occasionally, vegetable-tanned leather. This alum-tanned leather, however, was used for shoe linings at the time of the approval of the act. Some time after the Tariff Act of 1922 became effective, the same leather again came into use as an outside shoe leather. The court held the leather to be free as shoe leather. In so doing, the court said:

The language of paragraph 1431 implies that Congress knew that certain of the leathers therein provided for are used for shoe leather which, of course, means in making shoes, and it must have intended that leathers chiefly so used should not be classifiable thereunder. If it had intended to distinguish between leathers used for the inside or the outside of shoes or to have made the method of tanning them the test of classification, it could easily have used language conveying that intention.

The fact that the use of goat and sheep skin leather in the manufacture of shoes has been enlarged or extended since the enactment of the present act does not, in any wise, militate against the importer's contention.

    *       *       *       *       *       *       *

In the case at bar it is not necessary to rely altogether upon the above rule because, as already appears, goat and sheep leathers have for a long time been used to make shoes, and the mere incident that some particular variety thereof not formerly so generally used, has now been found adaptable and is chiefly used for that purpose, can not deprive it of the benefit of free entry.

It is well established that tariff statutes are made for the future as well as for the present and that the statutory term "shoe leather"

reaches out and embraces subsequent merchandise, the existence of which was not known to commerce prior to the effective date of the Tariff Act of 1922. *Pickhardt* v. *Merritt*, 132 U. S. 252. But the application of this rule was not required in either the *Goldsmith* or *Hudson* case, *supra*. In both cases the court was dealing with products known to the trade prior to the enactment of the particular tariff act involved.

Testing the facts as shown by the record by the rule of law announced in the cases above cited, the court below seems to have committed no error in permitting free entry for the imported goods.

The argument is made that the Congress certainly did not intend to give free entry to such expensive and highly ornamented leather, fit only to be classified as a luxury. It may be equally as well argued that the Congress, in its desire to modify the high cost of living, was not unduly exercised about permitting free entry of every piece of ephemeral and fanciful footwear with which the lady of fashion might clothe her dainty and aristocratic feet. Be that as it may, however, the Congress, in paragraph 1607, provided for the free entry of boots and shoes made wholly or in chief value of leather. This includes every grade, from the lowest to the highest. There is, therefore, nothing unusual or novel in the free admission of all boot and shoe leather, of whatever grade or cost.

Error is assigned in the refusal of the trial court to admit in evidence the certain certified statistical statements of the Department of Commerce, hereinbefore referred to. We have examined these records and can find no reversible error in their refusal. While they might have properly been received in evidence and given such consideration as they were entitled to, we can see little or no probative force in them. They were intended to show that a majority of all "fancy leather" used in the United States at the times of importation was used for other than shoe purposes. This evidence, together with other oral testimony offered along the same line, was, in our opinion, too indefinite in itself to be pertinent. The fact that the imported leather belonged to the class of "fancy leather," and that the leather chiefly used for other than shoe purposes also belonged to the same class proves nothing in itself. If, in fact, the evidence shows that all kinds of fancy leather are identical in designation, quality, and use, then such proffered testimony becomes material. The trial court has found, however, and the record affirmatively shows they are not so identical, but differ in said respects. Hence, the proffered testimony became immaterial, and it was not error to refuse its admission.

For the reasons assigned, the judgment of the Customs Court is *affirmed*.