PARAMOUNT PICTURES, INC. *v.* UNITED STATES (No. 4597)[1]

United States Court of Customs and Patent Appeals, January 5, 1949

*Lawrence, Tuttle & Harper (Walter I. Carpeneti* and *George R. Tuttle* of counsel) for appellant.

*David N. Edelstein,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* and *Joseph F. Donohue,* special attorneys, of counsel), for the United States.

[Oral argument December 8, 1948, by Mr. Tuttle and Mr. Donohue]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, C. D. 1098, holding exposed, undeveloped, negative motion-picture film, not of "American manufacture exposed abroad for silent or sound news reel," dutiable at one cent per linear

---

[1] C. A. D. 395.

foot, as assessed by the collector at the port of Los Angeles, California, under paragraph 1551 of the Tariff Act of 1930, as modified by the Mexican Trade Agreement, effective January 30, 1943, T. D. 50797.

Paragraph 1551, as modified by the Mexican Trade Agreement, so far as pertinent, reads:

> Photographic-film negatives, imported in any form, for use in any way in connection with moving-picture exhibits, or for making or reproducing pictures for such exhibits, except undeveloped negative moving-picture film of American manufacture exposed abroad for silent or sound news reel:
>
> Exposed but not developed _____ 1¢ per lin. ft.

The only material change made in paragraph 1551 of the Tariff Act of 1930 by the Mexican Trade Agreement for photographic-film negatives reduced the duty from two cents per linear foot to one cent per linear foot.

The importer protested the collector's classification, claiming, among other things not of importance here, that the involved photographic-film negatives were dutiable at one cent per linear foot on one-third only of the number of linear feet imported, for the reason that, when developed in this country into technicolor motion picture film, it took three feet of the imported negatives to make one foot of technicolor film suitable to be exhibited in theaters.

It appears from the record that the involved photographic-film negatives were produced by a special camera designed and built by the Technicolor Motion Picture Corporation; that the camera used three separate recording films, each of which was sensitive to part of the visible spectrum; that, as stated by appellant's witness John R. Clark, Jr., assistant to the president of the Technicolor Motion Picture Corporation, the three separate recording films "* * * are commonly referred to as the red, green, and blue parts, and hence they are known as the red, green, and blue separation records, or separation negatives;" and that after the sensitized films have been exposed in the technicolor camera, they are imported into the United States and delivered to the Technicolor laboratory where they are developed.

The witness further stated that "After development, they are similar to black and white negatives in that they represent or show the scene before the camera in various gradations of silver. * * * From these three color separation records are made special positives known as matrices. One matrix is printed from each color separation record. These matrices are similar to plates used in lithography. Each of these matrices is immersed in a dye bath of proper color, * * *" and that each "dye image is transferred onto a single film one after the other. That is to say, first one matrix transfers its image, and then the second and third matrix, all in superimposition on a single piece of film." It is the latter film which is shown in the theater and, as the witness stated, "is a reproduction in natural color of the scene which

was originally before the Technicolor camera." It further appears that the Technicolor Motion Picture Corporation sells the imported negatives and thereafter develops and produces the positive film for its customers.

It appears from the record that the three imported photographic-film negatives are never physically joined together in this country and that the fourth film, which is used in motion picture theaters, "is the result of the combination of filming the three strips into one."

It was further stated by appellant's witness that the articles as imported were exposed, undeveloped, film negatives. The witness testified that the technicolor process, that is, the *three-color process*, first came into existence commercially in approximately 1932 or 1933.

Although the record, as hereinbefore stated, discloses that the imported articles were photographic-film negatives, it is, nevertheless, argued by counsel for appellant that as each of the three negatives was identical except that they differed in color, so far as the scene photographed was concerned, and as they could be used only in connection with each other in producing the final positive film to be exhibited in theaters, each of the imported negatives was only one-third part of a negative. It was further argued by counsel for appellant that as the three-color technicolor process was not in existence at the time of the enactment of the Tariff Act of 1930, it was not the intention of the Congress to include in paragraph 1551, *supra*, film, like those in the instant case, as three separate and distinct negatives.

The trial court considered the evidence and called attention in its decision to the fact that all of the processes in the United States to which the imported negatives were subjected, in order to produce a technicolor film which could be used in the theater, had nothing to do, in view of the language of paragraph 1551, *supra*, with the classification of the photographic-film negatives here involved.

It being conceded by the witness who testified for appellant that each of the red, blue, and green negatives was a photographic-film negative at the time of its importation into the United States from Mexico, we are in agreement with the trial court that the classification by the collector was correct and that it was not contemplated by the Congress that three imported photographic-film negatives should pay duty of only one cent per linear foot on one-third thereof.

It will be observed that the statute provides for "Photographic-film negatives, imported *in any form*, for use *in any way* in connection with moving-picture exhibits, or for making or reproducing pictures for such exhibits * * *." (Italics supplied.) The only exception provided for by the statute is for "undeveloped negative moving-picture film of American manufacture exposed abroad for silent or sound news reel." Furthermore, the Congress was informed by the Summary of Tariff Information, 1929, Vol. 2, p. 2134, that "Film negatives are sensitized films which have been exposed in the camera.

They may be either developed or not developed. A developed negative film is one that has been chemically treated so that prints or positives can be made from them."

It is well settled that tariff statutes are enacted "for the future as well as for the present" and that they cover articles which were developed subsequent to their enactment and are clearly covered thereby. *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T. D. 43294, and authorities therein cited.

We are of opinion that the involved photographic-film negatives were dutiable as assessed by the collector, and as held by the trial court, at one cent per linear foot and not at one cent per linear foot for only one-third of the linear feet of the imported photographic-film negatives.

For the reasons stated, the judgment of the United States Customs Court is *affirmed*.