Nylos Trading Company *v.* United States (No. 4614) [1]

United States Court of Customs and Patent Appeals, December 12, 1949

*John D. Rode* for appellant.

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue* and *Alfred A. Taylor, Jr.,* special attorneys, of counsel), for the United States.

[Oral argument October 6, 1949, by Mr. Rode and Mr. Donohue]

_____

[1] C. A. D. 423.

Before Garrett, Chief Judge, and Jackson, O'Connell, and Johnson, Associate Judges

Johnson, Judge, delivered the opinion of the court:

The Nylos Trading Company has appealed from the judgment of the United States Customs Court, First Division (28 U. S. C. 1541, 2601), rendered pursuant to its decision, C. D. 1133 (21 Cust. Ct. 86), sustaining the action of the Collector of Customs in assessing duty on 63 drums of oil imported from Brazil at the rate of 20 per centum ad valorem. The assessment was made under the provisions of paragraph 53 of the Tariff Act of 1930, 19 U. S. C. A. 1001, par. 53,[1] the merchandise being classified by the collector as "all other expressed or extracted oils, not specially provided for." The Trading Company protested (19 U. S. C. A. 1514, 1515) that decision of the collector, Protest 127415–K/1720, claiming that the imported merchandise, invoiced as "Pataua oil," should be entitled to free entry under the provisions of paragraph 1732 of the tariff act, 19 U. S. C. A. 1201, par. 1732,[2] as "Oils, expressed or extracted: * * * palm."

The trial court held that the term used in paragraph 1732 had not been intended by Congress as a descriptive term, but rather as an eo nomine designation for the oil obtained from the fruit of the palm Elaeis guineensis; that the commercial understanding of the term "palm oil" included only the oil of the palm Elaeis guineensis; that the commercial understanding and common meaning of the term were the same; and that the oil at bar, having been obtained from the fleshy part of the fruit of the palm Oenocarpus bataua was not within the commercial designation or the common meaning of the term "palm oil." The oil at bar was held, therefore, to be excluded from the classification claimed by the importer, and the trial court concluded that the collector's classification of the merchandise was proper.

The appellant's assignment of errors supporting his petition to this court for review of the law and facts of the case reaches each of the trial court's findings. The importer's position before us is that the provision in paragraph 1732, supra, for "Oils, expressed or extracted: * * * palm" is without limitation, and that under the rule of Nootka Packing Co. v. United States, 22 C. C. P. A. (Customs) 464, 470, T. D. 47464, that provision covers "all palm oils."

The question to be decided is whether the term "palm oil" is, as

---

[1] Par. 53. Oils, vegetable: Castor, 3 cents per pound; hempseed, 1½ cents per pound; linseed or flaxseed and combinations and mixtures in chief value of such oil, 4½ cents per pound; olive, weighing with the immediate container less than forty pounds, 9½ cents per pound on contents and container; olive, not specially provided for, 6½ cents per pound; poppy seed, 2 cents per pound; rapeseed, 6 cents per gallon; all other expressed or extracted oils, not specially provided for, 20 per centum ad valorem.

[2] Par. 1732. Oils, expressed or extracted: Croton, palm, perilla, and sweet almond; olive, palm-kernel, rapeseed, sunflower, and sesame oil, rendered unfit for use as food or for any but mechanical or manufacturing purposes, by such means as shall be satisfactory to the Secretary of the Treasury and under regulations to be prescribed by him; tung oil; and nut oils not specially provided for.

the Government in substance contends, a commercial designation which in its trade understanding as well as its common meaning excludes the oil obtained from the fruit of the palm *Oenocarpus bataua.* A decision of this question will resolve the issue of whether the merchandise at bar is properly classifiable under paragraph 53 or under paragraph 1732 of the cited tariff act.

Tariff laws are to be interpreted according to the common meaning of their terms, or according to their commercial designation where the latter differs from the common meaning. *Hummel Chemical Co.* v. *United States,* 29 C. C. P. A. (Customs) 178, 183, C. A. D. 189; *Stephen Rug Mills* v. *United States,* 32 C. C. P. A. (Customs) 110, 115, C. A. D. 293. Congress is presumed to know the language of commerce, and the object of the tariff act is to classify substances according to the general usage and denominations of trade. The first and most important thing to be ascertained in construing a tariff act with regard to an article therein mentioned is its commercial designation. A distinction once made by Congress concerning a commodity must be applied in the future in the absence of a contrary legislative intention. *American Express Co.* v. *United States,* 10 Ct. Cust. Appls. 275, 286, T. D. 38680; *United States* v. *Davies Co.,* 11 Ct. Cust. Appls. 392, 395, T. D. 39317. The commercial meaning of tariff terms is presumptively the common meaning. The burden of proof is on the one claiming a different meaning to establish it by a preponderance of the evidence. *United States* v. *Georgia Pulp and Paper Manufacturing Co.,* 3 Ct. Cust. Appls. 410, 415, T. D. 32998. A commercial designation is the result of established usage in commerce and trade which is definite, uniform, and general, *United States* v. *Kwong Yuen Shing,* 1 Ct. Cust. Appls. 14, T. D. 30773; *United States* v. *Burlington Venetian Blind Co.,* 3 Ct. Cust. Appls. 378, T. D. 32967, and where the trade meaning is universal and so well understood that it is presumed Congress and the trade were fully acquainted with the practice when the tariff act was passed. *United States* v. *Fung Chong Co.,* 34 C. C. P. A. (Customs) 40, 42, C. A. D. 342. Where the Government contends that an *eo nomine* designation in the tariff law is a commercial or trade term excluding merchandise the subject of a protest, it must prove that as used in commerce the term has a meaning which is *general,* extending over the entire country; *definite,* certain of understanding; and *uniform,* the same everywhere in the country. *United States* v. *Georgia Pulp and Paper Manufacturing Co., supra.* Where a particular commodity was for a time the only article appearing in trade which came within the common meaning of the tariff term, the application of the term to that commodity alone was not a peculiar trade usage of the term, but indicated merely that the familiar commodity was then the only subject of importation coming within

the common meaning of the term. That fact would not exclude other new articles possessing similar characteristics from the classification where the new articles resembled the well known commodity in those particulars which the statute established as criteria of the classification. *Klipstein & Co.* v. *United States*, 4 Ct. Cust. Appls. 510, 514, T. D. 33936; *United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, 371, T. D. 43092. It is not disputed that tariff statutes are made not alone for the present but the future as well. A statutory term may embrace subsequent merchandise whose existence was unknown commercially when the tariff act was enacted. *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, 560, T. D. 43294; See *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, 479, T. D. 44762, *Chicago Mica Co. et al.* v. *United States*, 21 C. C. P. A. (Customs) 401, 405, T. D. 46927; *United States* v. *L. A. Salomon & Bro.*, 22 C. C. P. A. (Customs) 490, 495, T. D. 47483. Tariff acts are not drafted in the language of science, and even though imported merchandise would fall within the term of the tariff act if considered as scientific terminology, such a classification would not be proper for customs purposes unless the scientific meaning coincided with the common meaning or commercial designation. And where the Government fails to prove a commercial designation but does establish that the merchandise at bar is not bought or sold under the tariff term, and that an order expressed in that term would not be considered as filled by a delivery of the protested merchandise, the merchandise cannot be held properly classified under the tariff term. *Meyer and Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436. Where the scientific meaning of a term differs from the common meaning, expert testimony as to the scientific meaning has no probative value. Testimony as to the common meaning itself is only advisory, as the court may take judicial notice of such meaning. *Hummel Chemical Co.* v. *United States*, *supra*, and *Stephen Rug Mills* v. *United States*, *supra*.

Upon the importer rested the dual burden of proving that the collector's classification was incorrect, and the classification claimed in the protest was proper. *United States* v. *Gardel Industries*, 33 C. C. P. A. (Customs) 118, C. A. D. 325. Since the meaning of the tariff term is presumptively the common meaning, the importer may prevail here if by the weight of the evidence he has established that the imported merchandise falls within the common meaning of the cited language of paragraph 1732. But if the Government, contending for a commercial or trade meaning of the term, carries the burden of proof thereby imposed, and establishes a general, uniform, and definite commercial meaning of the term such as excludes the merchandise at bar, the judgment below will stand. Even if the

government fails to meet the burden of proof required to establish a commercial designation, if it proves that the imported merchandise is not bought and sold under the tariff term, and that a delivery of that merchandise against an order expressed in the term of paragraph 1732 at issue would not be considered as a good delivery filling the order, the judgment of the trial court must likewise be affirmed.

The evidence introduced by the Trading Company consisted of the testimony of four witnesses, and a laboratory report of the United States Customs Laboratory. The latter stated that the sample taken from the importation in suit to be "pataua oil, a vegetable oil obtained from the fleshy part of the fruit of the palm 'Oenocarpus Bataua.' " The importer's witnesses were, respectively, an employee of the Trading Company; a botanist employed at the New York Botanical Garden; a chemist in charge of manufacturing as well as the testing and development laboratories of the Conti Products Company, a manufacturer of Castille soap; and the chief chemist in the bureau of chemistry, New York Produce Exchange.

The importer's employee testified that he handled the purchases of chemicals for the Trading Company, and identified the shipment at bar as having been sold to the Conti Products Company.

The botanist testified that there are several hundred kinds of palm trees, divided botanically into the major groups cocoa palms, date palms, and oil palms; that the palms *Elaeis guineensis* and *Oenocarpus bataua* were members of the oil palm group; and that he had no knowledge of the physical appearance or characteristics of "pataua oil" or "palm oil" beyond the references appearing in the many books he had read on the subject of palms.

The chemist in charge of manufacturing and laboratories at Conti Products testified that the firm had imported "pataua oil" in substantial quantities for a period of five or six years; that the oil was used by the firm entirely in the manufacture of soap; that the "pataua oil" ranged in color from a slightly greenish cast to yellow; that some of the samples he had seen were clear, others cloudy; that he was familiar with the palm oil obtained from the palm *Elaeis guineensis*, having dealt with it in large quantities for 20 years; that he had used in the manufacture of soap two types of the latter oil, one of a deep orange color, in a semi-solid state, and possessing a characteristic odor at room temperature; the other a bleached palm oil, resembling butter in appearance, and without the characteristic odor of the other type. The Conti Products chemist further testified, as follows:

XQ. You have given us the physical characteristics of palm oil from the elaeis guineensis from West Africa and of the imported oil that is in suit here today. If you were to receive a shipment or delivery of pataua oil in response to an order for palm oil, would that be a good delivery?

Mr. Rode: I object to that question on the ground that is it speculative. It is a hypothetical question that doesn't specify what kind of palm oil he ordered.

Mr. Ribaudo: If Your Honors please, I don't think is it speculative.

Presiding Judge Oliver: Do you mean that if he got palm oil, would he accept it as a good delivery of elaeis guineensis palm oil?

Mr. Rode: I concede that he would not.

XQ. And in the converse, if you received a delivery of this palm oil from the elaeis guineensis, would you accept that as a good delivery of pataua oil?

*     *     *     *     *     *     *

A. I would not.

*     *     *     *     *     *     *

XQ. Did you ever requisition any oil?

Mr. Rode: Could you narrow that down?

XQ. Any palm oil of the elaeis guineensis.

A. Yes.

XQ. How did you designate the oil on that requisition?

A. Palm oil.

XQ. Simply asked for palm oil?

A. Yes.

XQ. Did you ever requisition pataua oil?

A. Yes.

XQ. And in what manner did you requisition that?

A. Pataua oil.

XQ. Now, when you requisition palm oil, what did you expect as a delivery there?

A. I expect palm oil coming from the Africa source.

XQ. The elaeis guineensis palm?

A. Yes.

XQ. And when you requisitioned pataua oil, what would you have expected for a delivery?

A. The oil originating from oenocarpus bataua.

The chief chemist of the bureau of chemistry of the New York Produce Exchange testified that he had been with the bureau since 1918, was familiar in a general way with most vegetable oils, was familiar with "pataua oil" and had seen specimens of oil from the palm *Elaeis guineensis* as well as the oil from the palm *Oenocarpus bataua*; that the characteristics of *Elaeis guineensis* palm oil, crude, were orange red to deep red in color, semi-liquid to solid fat, with a characteristic odor resembling that of wood violets, and possessing characteristics more fat than oil; that the characteristics of the oil from the fruit of the *Oenocarpus bataua* palm contrasted with that of

the *Elaeis guineensis* were those of a liquid oil versus a semi-liquid to a solid, a different color, one more resembling olive oil versus reddish, and possessing a characteristic odor resembling olive oil; that the *Oenocarpus bataua* was almost a complete substitute for olive oil, as complete as any found in the vegetable kingdom; that from a chemical analysis he had made of oils of types under consideration he had found two important chemical differences between them, viz., a lower iodine value and a higher melting point for *Elaeis guineensis* than *Oenocarpus bataua*; and that, bearing in mind the physical and chemical characteristics of the oils, they both are palm oils. The witness also testified as follows:

XQ. Would you consider a delivery of pataua oil like Defendant's Illustrative Exhibit B a good delivery for an order for palm oil like Defendant's Illustrative Exhibit A?
Mr. Rode: If Mr. Ribaudo will amend that to read an order for African palm oil, I won't object to it.
Mr. Ribaudo: All right. African palm oil.
Mr. Rode: No objection.

A. It would not be a good delivery. This would not be a good delivery for that (indicating).
Judge Mollison: B would not be a good delivery for an order for Exhibit A?
The Witness: That's right.

XQ. And would that be true conversely?

A. Yes, vice versa; that's right.

The Government's evidence at the trial consisted of the testimony of three witnesses, and three exhibits. One of the exhibits was American Oil Chemists Society Table I 1–46 entitled "Physical and Chemical Characteristics of Oils, Fats, and Waxes," listing data for many oils, among which are "Palm (African-Sumatran) Oil" and "Patau (Coumou) Palm Oil." The cross-examination of the chief chemist of the New York Produce Exchange developed that he was the compiler of that table. The remaining exhibits were samples of *Elaeis guineensis* palm oil (Defendant's Illustrative Exhibit A) and *Oenocarpus bataua* palm oil (Defendant's Illustrative Exhibit B). The Government's witnesses were respectively an employee of Balfour, Guthrie and Company, importers, and representative of the Plantation Growers of Africa; a plant chemical engineer of the Proctor and Gamble Company; and the Director of Standards and Quality Control of Colgate-Palmolive Peet Company.

The representative of the Plantation Growers of Africa testified that his business was buying and selling fats and oils; that he was familiar with the oil of the palm *Elaeis guineensis* from 25 years'

buying and selling experience with it; and that he had not handled pataua oil. He testified further, as follows:

Q. Mr. Bloodgood, what type of oils do you deal in, specific types?

A. May I answer what you want to know? Maybe I can do that. I started 20-some years ago with the development of palm oil, what we call palm oil throughout the world.

Q. Just a moment. You pointed to Defendant's Illustrative Exhibit A. Is that what is known as palm oil throughout the world?

A. Yes. I purchase and sell that or a similar type, a chemical variation of what we get and deliver, but I started with the agriculture, and developed in part the whole institution all the way through, including methods of trading goods going to Africa, the research, the bulk shipments from the original establishments, the research in the steel mills, and the use of it. This is a rough estimate, half-a-million tons.

Presiding Judge OLIVER. Throughout the United States?

The WITNESS: Yes, sir.

* * * * * * *

Q. Mr. Bloodgood, what is commonly known in the trade as palm oil?

A. Exhibit A is a sample of palm as it is traded in by us and others extensively and only under that name, and no other oil, to my knowledge, is called palm oil.

Judge MOLLISON: It is known as palm oil in the oil trade?

The WITNESS: That's right.

Q. Do you know the origin of the palm oil as shown in Illustrative Exhibit A?

A. From the Belgian Congo.

Q. Do you know the species of palm?

A. Yes, the elaeis guineensis.

* * * * * * *

XQ. Are you acquainted with Dr. George S. Jamieson?

A. I know him.

XQ. I would like to read you a statement on page 118 in the second edition of his book. "Palms: Pulp and Kernel Oils. A considerable number of palms produce fruits that yield oils, several of which have become of great economic importance. Without doubt, the oils of other palms, particularly some of those from Central and South America, will in time become important commercial products." Do you agree with that statement?

A. Yes, I do.

* * * * * * *

RQ. I would like to read from Jamieson's Second Edition, and ask you if you agree with the following remarks:

* * * * * * *

"The fleshy portion of the fruits from a number of different species of palms contains notable quantities of oil. With few exceptions, these 'pulp' oils are more or less semi-liquid, highly colored products. On the other hand, the oils from the fruits of various species of Oenocarpus and the segen palm (Jessenica polycarpa) are liquid and resemble oilve oil in many respects.

The most important pulp oil is the 'palm oil' of commerce, from the fruit of the Elaeis guineensis." Do you agree with that statement by Dr. Jamieson?

A. Yes.

The plant chemical engineer of Proctor and Gamble Company testified that he had been employed by that company since 1918, serving variously in the chemical and soap-making departments, in experimental and developmental work, and as head of the technical service of the Staten Island plant; that he supervises a laboratory where samples of oil cargo consigned to his firm are given chemical examinations; that he has seen samples and examined deliveries of palm oils; that he would recognize as "palm oil" an oil having a color of yellow, orange, or red, and having the odor of wood violets; that he considered Defendant's Illustrative Exhibit A to be the palm oil known in the trade; that between three and four million pounds per month of it have been used in the Staten Island plant; that he was not acquainted with the oil of Defendant's Illustrative Exhibit B, and that in considering whether it were "palm oil" it did not smell or look familiar.

The final Government witness, the Director of Standards and Quality Control of Colgate-Palmolive Peet Company, testified that he has been employed by that and an antecedent company since 1910; that he is a chemist by profession; that Defendant's Illustrative Exhibit A is known in the trade as palm oil; that he could not identify Defendant's Illustrative Exhibit B by looking at it; that he had never used or tested "pataua oil." He testified further:

Q. Have you come in contact with any other oil in your business that differs from Illustrative Exhibit A which you called palm oil and was classified as palm oil?

A. No. The only palm oil I know in the trade is something that looks like this, Exhibit A.

\*      \*      \*      \*      \*      \*      \*

Judge COLE: Doctor, do you know what pataua oil is?

The Witness: I have seen samples, Your Honor. It has been submitted to me for an opinion as to whether we should use it or not. Oils come to me for an opinion as to whether we should use them, and I have never recommended its use.

The importer's evidence established that *botanically* classified, the oil at bar, *Oenocarpus bataua*, is a "palm oil"; that the oil was used by one manufacturer in the making of soap; that it is a clear to cloudy liquid, from green to yellow in color, and almost a complete substitute for olive oil; that *Oenocarpus bataua* would not be a good delivery for *Elaeis guineensis* palm oil and vice versa; that *Oenocarpus bataua* is requisitioned as "pataua oil" while *Elaeis guineensis* is requisitioned as "palm oil"; that crude *Elaeis guineensis* palm oil is orange to red in color, semi-liquid to solid, with the characteristics of fat rather than

oil, and the characteristic odor of wood violets; that *Elaeis guineensis* and *Oenocarpus bataua* differ chemically and physically in that the former has a lower iodine value and a higher melting point.

The Government's evidence established that the palm oil familiar to the trade is that from the palm *Elaeis guineensis;* that the oil from the *Oenocarpus bataua* is not familiar in the trade as "palm oil"; that those skilled in the trade do not know it or refer to it as "palm oil."

The Government's position that the Congress intended the paragraph 1732 provision for palm oil to apply to the oil of a particular species of palm is supported by the following data quoted from Tariff Information Summaries for 1920, 1921, and 1929, all of which were available and known to Congress prior to the enactment of the Tariff Act of 1930:

*Summary of Tariff Information*, 1920, p. 734:

Palm oil is obtained from the outside fleshy portions of the ripe fruit; palm-kernel oil, from the kernels of the seeds. Forests of palm trees grow on the west coast of Africa, practically the only source of supply. Another species of palm is cultivated in South America, the West Indies, Java, and North Burma, but its yield of oil is commercially unimportant.

*Summary of Tariff Information*, 1921, p. 1396, contains the identical statement quoted above.

*Summary of Tariff Information*, 1929, vol. 2, p. 2487:

Palm oil is obtained from the outside fleshy portions of the ripe fruit of the palm tree, which is grown principally in West Africa and in Sumatra. * * * Palm oil is usually orange colored, but may be bleached white. * * *

Palm oil is produced chiefly in those countries bordering the Gulf of Guinea on the west coast of Africa, including Nigeria, The Gold Coast, Sierra Leone, the Congo, Dahomey, the Ivory Coast, Togoland, the Cameroons, and Portuguese Guinea. The industry has existed in Africa for many years. * * *

The United States requirements are supplied by imports. The imports of palm oil have almost tripled since 1922. They originate in west Africa and Sumatra and are shipped, as a rule, directly from those countries. * * *

The evidence fully supports the trial court's finding that the language of paragraph 1732 of the Tariff Act of 1930 is an *eo nomine* provision limited to a particular oil by a proved commercial designation. The limited application of the term "palm oil" to the oil from the fruit of the palm *Elaeis guineensis* clearly appears to be general, definite, and uniform. In order for the merchandise at bar to be classified under that term it would be necessary that the importer prove that it is moving in the channels of trade under that designation. *Meyer and Lange et al.* v. *United States, supra.* A commercial designation having been proved, the case is taken out of the rule of the *Nootka Packing* case, *supra*, that "an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and

*without proof of commercial designation,* will include all forms of said article." (Italics supplied in latter part of quotation.) It will avail nothing to say that the imported merchandise comes from an oil palm. The real question is whether as imported the oil from the *Oenocarpus bataua* palm has a commercial designation distinct from that given an article (palm oil) falling under a different classification; or whether there is a commercial distinction between them which brings the oil at bar within the terms of the paragraph where it is assessed. Cf. *Seward* v. *United States*, 9 Ct. Cust. Appls. 4, 9, T. D. 37842; see *Draeger Shipping Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 454; 459, T. D. 42644. Appellant has not proved that the oil of the palm *Oenocarpus bataua* moves at all in commerce under the term "palm oil." The testimony of appellant's own witness tends to show that the oil at bar moves in commerce as "pataua oil," not as "palm oil," and the invoice supports such a conclusion. Even if the government's burden of proving the commercial meaning alleged for "palm oil" were not adequately met, appellant has not shown that the oil at bar is bought and sold under the tariff term. There is ample evidence that the merchandise at bar is not bought and sold under the term "palm oil." The evidence also establishes that a delivery of the merchandise at bar would not be considered as filling an order expressed in the term of the tariff act. Those facts support the trial court's decision under the rule of *Meyer and Lange et al.* v. *United States, supra.*

The scientific or botanical classification established by appellant is, of course, of no probative value where that classification differs from the common or commercial understanding of the term. *Meyer and Lange et al.* v. *United States, supra; Hummel Chemical Co.* v. *United States, supra.* That it differs from the common meaning of the term "palm oil" is well demonstrated by the references to definitive works cited by the trial judge, the effect of which we do not deem to be overcome by those cited in appellant's brief. In view of what we have already held regarding commercial designation, we consider it unnecessary to go into an extended discussion of the technical citations. Nor is the instant case within the rule of the *Klipstein, Schade, Downing, Wilbur-Ellis, Chicago Mica,* or *Salomon* cases, *supra,* which hold generally that tariff acts being made for the future as well as the present, terms therein may embrace merchandise subsequently originating in commerce, not known or contemplated at the passage of the act.

In the *Klipstein* case, the term of the tariff act under which the importer was seeking to have the merchandise there at bar classified was held not to have a commercial designation such as would exclude the merchandise from the meaning of that term; further, the mer-

chandise there at bar was held not to have a commercial designation excluding it from the classification of the tariff term claimed. In the instant case, the evidence establishes that at the passage of the tariff act, as well as at the time of the trial, the tariff term, palm oil, had a commercial meaning which excluded from its signification the oil of the palm *Oenocarpus bataua*, the subject of the protest at bar; further, the designation by which that oil is known in the channels of trade appears to distinguish it commercially from "palm oil."

In the *Schade* case, proof of commercial designation had not been made, and the court concluded that the cod liver oil-cake meal of the protest was not a species of the tariff term, "oil-cake meal." The importer there failed to prove that the merchandise at bar was within the common meaning of the tariff term, or that a commercial designation existed which would admit that merchandise to classification under the tariff term. In the instant case, the importer has failed to prove that the oil at bar is embraced within the common—not the scientific—meaning of the tariff term, and the government's evidence has established a continuing commercial designation of the tariff term which excludes the imported item here at issue from its purview.

In the *Downing* case, the appellant there was contending that the dutiability of an article must be measured by its common or commercial designation *at the time of the approval* of the tariff act involved. The court properly held, however, that inasmuch as the record established the chief use of the fancy leather there in issue at the time of importation was in the making of shoes, the tariff term, "shoe leather," which at the passage of the act did not include such merchandise, nevertheless reached out and embraced the item subsequently originating in commerce. In the instant case, there is no evidence of record that the oil at bar is known, or moves at all in commerce as "palm oil," and there is strong evidence to establish that "palm oil" is a continuing commercial designation restricted in its connotation to a specific oil other than the one at bar.

In the *Wilbur-Ellis* case, the court noted that tariff statutes are for the future as well as the present, and held that while the commercial or common meaning of an *eo nomine* designation in a tariff act must be determined *as of the date of the act*, a different rule should prevail for a "chief use" designation; viz., the question of chief use should be determined *as of the date of importation* of the litigated merchandise. Nothing in that case supports the importer's position herein.

The rule of the *Chicago Mica* case does not control in instant case because there was no question in issue there of commercial designation. The article there at bar, though little availed of, did exist at the time the tariff act there involved was passed, and when it began to move in commerce as a result of processes developed for its utilization, it was properly classified where *eo nomine* designated in the act. Here,

however, we have an *eo nomine* provision limited by a proved commercial designation excluding the merchandise at bar which concededly is not known in trade at all under the tariff term.

The rule that tariff statutes are made for the future as well as for the present was applied by the court in the *Salomon* case in meeting a contention of the importer that the merchandise there in issue, activated fuller's earth, was not properly classified by the collector as "clays or earths artificially activated with acid or other material" because, it was suggested, Congress was of the impression that fuller's earth could not be artificially activated, being a naturally activated material, and therefore Congress must have intended that the two fuller's earth provisions in the tariff to cover fuller's earth in every form. The court held that the term "clays and earths artificially activated with acid or other material" was intended by Congress to include *all* clays and earths so treated, and that fuller's earth subsequently moving in trade as an artificially activated material was thereby embraced by the tariff term. Here, in the instant case, we are convinced by the evidence and the Tariff Information Summaries, that Congress intended that the paragraph 1732 provision for palm oil embrace *only* the oil commercially designated as palm oil, i. e., that of the palm *Elaeis guineensis*.

We hold that the appellant has not met his burden of proving by the weight of the evidence that the collector erred, nor has he proved that the classification contended for is correct. The lower court's decision is not contrary to the weight of the evidence, and accordingly, *United States* v. *Arnhold & Co. Inc.*, 27 C. C. P. A. (Customs) 135, 142, C. A. D. 74, we *affirm* the trial court's judgment.

GARRETT, C. J., concurs in the result.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.