**BENRUS WATCH COMPANY, Inc., et al.**

v.

**UNITED STATES.**

No. 2469.

United States Customs Court, Second Division.

June 30, 1964.

**192**

Covington & Burling, Washington, D. C. (Stanley L. Temko and Mark A. Weiss, Washington, D. C., of counsel); Lane, Young & Fox, New York City (William H. Fox, New York City, of counsel), associate counsel; for plaintiffs.

Andrew P. Vance, Chief, Customs Section, Washington, D. C. (Sheila N. Ziff and Herbert L. Warren, New York City, trial attorneys), for defendant.

Before LAWRENCE, RAO, and FORD, Judges.

LAWRENCE, Judge.

This cause of action presents for our determination the question whether the collector of customs properly withheld delivery to the plaintiffs of certain watch movements, imported from Switzerland, on the ground that they were not accurately marked, as required by applicable provisions of the statute quoted, infra.

The jurisdiction of the court was invoked by the protests specified below, duly filed pursuant to section 514 of the Tariff Act of 1930 (19 U.S.C. § 1514), which were consolidated for trial:

Protest 62/1791—Benrus Watch Company, Inc.

Protest 62/1792—Wittnauer Watch Co., Inc.

Protest 62/1793—Longines-Wittnauer Watch Co., Inc.

Protest 62/1794—Jean R. Graef, Inc.

The four protests listed above, each filed by a different importer, are similar in form and content and clearly set forth the issue presented to the court for determination. Quoted is protest 62/1791, filed by the Benrus Watch Company, Inc.—

"We refer to letter from Irving Fishman, Deputy Collector, Restricted Merchandise Division, dated October 12, 1961, addressed to Benrus Watch Co., Inc., 50 West 44th Street, New York, New York, with respect to Entry No. 456481 of August 18, 1958.

"Protest is hereby made by the undersigned against your decision, including the legality of all orders and findings entering into the same, excluding from entry and/or delivery the shipment of watch movements covered by the importation below described, the reasons for our objection and our claims being as follows:

"1. Your decision finds that certain movements covered by the aforementioned entry which are now marked 'unadjusted' have been adjusted to two positions and must be so marked to comply with the requirements of paragraph 367 of the Tariff Act of 1930. We claim that the said movements have not been adjusted to position and are in fact unadjusted and that the marking thereon as 'unadjusted' is a complete and proper marking in conformity with the requirements of said paragraph 367 of said Act.

"2. The corrections which were made after assembly of the movements covered by the aforementioned entry, as set forth in the information furnished pursuant to Treasury Decision 54286, are not such as would make said movements adjusted to two positions and said movements are in fact 'unadjusted'.

Imported watch movements manufactured and corrected in substantially the same manner as the said movements and marked 'unadjusted' were, from the enactment of said Tariff Act of 1930 until the promulgation of Treasury Decision 54286, uniformly classified and assessed by you as 'unadjusted' for duty purposes.

"3. The manufacturer or producer of a watch movement is the only one in a position to determine whether a movement has been subjected to any 'adjustments' or is 'unadjusted', within the meaning of paragraph 367(a) (4) and (b) of said Act, and said manufacturer or producer is authorized to make such determination and to mark the movement accordingly, and additional duties for 'adjustments', if any, are to be levied on the basis of the said markings on a movement as determined by the manufacturer or producer.

"4. In any event, under said paragraph 367 the determination to mark a watch movement either with number and class of adjustments or the word 'unadjusted' is within the sole discretion of the manufacturer or producer of such movement, and additional duties for 'adjustments', if any, are to be levied on the basis of the markings on such movement as determined by the manufacturer or producer.

"5. Insofar as your decision that said movements are adjusted to two (2) positions rests on Treasury Decision 54286, said Treasury Decision is not authorized by, and is in conflict with said paragraph 367 and, therefore, is invalid, illegal, null and void.

"6. The said movements, being properly marked in conformity with the requirements of said Act, are not subject to any additional duties for position adjustments under the provisions of paragraph 367(a) (4) of said Act.

"7. The said movements are properly marked 'unadjusted' and the rates of duty applicable to the said movements should be no higher than as specified in subdivisions (1), (2), and (3) of paragraph 367 (a) of the Tariff Act of 1930, as modified by the Trade Agreement with Switzerland (T.D. 48093) and Presidential Proclamation No. 3062 of July 27, 1954 (T.D. 53551)."

The letter from Irving Fishman, deputy collector, referred to in the first paragraph of the above protest reads as follows—

"You are advised that a shipment consisting of two cases of watches and watch movements entered by you under Entry No. 456481 of August 18, 1958, has been detained for lack of proper marking under paragraph 367 of the tariff act.

"According to a report received from the Appraiser of Merchandise, 4 movements which are marked 'unadjusted' have been adjusted to two positions and should be so marked to comply with the requirements of the above paragraph. The language of this paragraph contemplates that in addition to other markings, watch movements classified therein shall be marked 'In words and in Arabic numerals, the number and classes of adjustments.'

"This shipment will not be released until it has been properly marked."

As were the three other protests involved in this litigation, protest 62/1791 was forwarded to the court by the collector of customs accompanied by a "Memorandum re ' Protest," which states—

"This protest is against the collector's refusal to deliver certain watch movements on the ground that the watch movements were not properly marked to show the number of positions for which the movements were adjusted. See paragraph 367(b) Tariff Act of 1930.

"The collector's refusal to deliver in his letter of October 12, 1961, a

copy of which is attached to the invoice. This protest is timely filed against that refusal. Note T.D. 54286."

Pertinent provisions of the involved statute and of certain Treasury Decisions promulgated to "Collectors of Customs and Others Concerned" to bring about uniform application of the statute are here set forth:

Paragraph 367 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 367):

"(a) Watch movements, and timekeeping, time-measuring, or time-indicating mechanisms, devices, and instruments, whether or not designed to be worn or carried on or about the person, all the foregoing, if less than one and seventy-seven one-hundredths inches wide, whether or not in cases, containers, or housings:

\* \* \* \* \*

"(4) any of the foregoing shall be subject to an additional duty of $1 for each adjustment of whatever kind (treating adjustment to temperature as two adjustments) in accordance with the marking as hereinafter provided; *

\* \* \* \* \*

"(b) All the foregoing shall have cut, engraved, or die sunk, conspicuously and indelibly on one or more of the top plates or bridges: The name of the country of manufacture; the name of the manufacturer or purchaser; in words and in Arabic numerals the number of jewels, if any, serving a mechanical purpose as frictional bearings; and, in words and in Arabic numerals, the number and classes of adjustments, or, if unadjusted, the word 'unadjusted'.

\* \* \* \* \*

"(j) An article required by this paragraph to be marked shall be denied entry unless marked in exact conformity with the requirements of this paragraph."

Treasury Decision 50277(3), 76 Treas. Dec. 155, 156 (1940):

"(3) *Watch movements and timekeeping devices.*—Watch movements and other mechanisms, devices and instruments provided for in paragraph 367(a) are properly marked 'unadjusted' under paragraph 367 (b) if they have not been specially manipulated, otherwise than by ordinary assembly, to produce one or more of the following results: (a) temperature adjustment, (b) isochronal adjustment, or (c) position adjustment. Bureau letter to collector of customs, New York, N. Y., dated November 5, 1940 (426.843)." [Italics quoted.]

Treasury Decision 54286, 92 Treas. Dec. 15, 16, 18 (1957):

\* \* \* \* \* \*

"The decision published as T.D. 50277(3) has been extensively reviewed in the light of all representations and pertinent considerations. The Bureau has concluded that no change should be made therein, but that the following clarification of the meaning of the term position adjustment would be helpful.

"Position adjustments in a watch movement, mechanism, device, or other instrument, however accomplished, result in correlation between the rates of timekeeping in various positions to meet specific precision tolerances. Any such instrument shall be considered as adjusted to position if, after assembly, it has been tested in two or more positions and specially manipulated in any manner which reduces to a prescribed limit of 45 seconds or less the observed differences between the rates in any of the positions in which tested and/or corrects the rate in any tested position for an instrument for which there is a prescribed tolerance not exceeding 45 seconds fast for one or more posi-

---

* Additional duty of $1 was reduced to 50 cents by the Swiss Trade Agreement, 69 Treas. Dec. 74, T.D. 48093.

tions. The number of adjustments shall equal the number of positions in which the instrument was so tested, if tests were made in more than one position.

"The term 'specially manipulated' does not include manipulation necessary to the process of timing and regulation, which is not considered as adjustment within the meaning of paragraph 367 of the tariff act. That process results solely in making the instrument run faster or slower to the same extent in each and every position and does not result in any modification of any difference between rates in the individual positions. Any operation which results in making the instrument run faster or slower to a different extent in any tested or observed position than in any other tested or observed position, or results in a modification of any difference between rates in the individual positions, goes beyond the process of timing and regulation.

"In order to facilitate the determination of whether imported watch movements or other mechanisms, devices, or instruments provided for in paragraph 367(a) of the Tariff Act of 1930, have been specially manipulated after assembly to produce an adjustment or adjustments within the meaning of paragraphs 367(a) and 367(b) of the act and T.D. 50277(3), certain information is required. * * *

*       *       *       *       *

"In order to provide sufficient time to comply with these requirements this amendment shall become effective after 180 days after publication in the weekly Treasury Decisions."

It may be noted here that with each shipment a certificate was attached to the invoice by the manufacturer in Switzerland to meet the requirements of said T.D. 54286. It contains information to facilitate the determination of whether the imported watch movements

"have been specially manipulated after assembly to produce an adjustment or adjustments within the meaning of paragraphs 367(a) and 367(b) of the act and T.D. 50277(3), * * *."

Plaintiffs claim that the certificates show that the tests made on the movements were in the nature of repairs or corrections; that in no sense did they constitute adjustments to two positions.

At the opening of the trial, counsel for the United States stipulated and agreed with counsel for plaintiffs that the 10 Girard-Perregaux movements involved in protest 62/1794, in the name of Jean R. Graef, Inc., and one of the movements, No. 10377486, covered by protest 62/1793, in the name of Longines-Wittnauer Co., Inc., are, in fact, unadjusted within the meaning of paragraph 367(b) (j).

Plaintiffs introduced the testimony of the seven witnesses described below.

M. Fred Cartoun, chairman of the Board of Longines-Wittnauer Watch Co., Inc., New York City, importer and dealer in watch movements and watches, has been associated with the Longines-Wittnauer Watch Co., Inc., since 1936 in an executive capacity.

Jean Robert Graef, president of Jean R. Graef, Inc., importer of the Girard-Perregaux watches; educated in Switzerland; a graduate of the Federal Institute of Technology, Zurich, Switzerland, as a mechanical and electrical engineer; entered the watch business in the United States in 1925 and, since that time, has been chief executive of his company, which is engaged in the importation of Swiss watches and movements and their sale in the United States.

Henry B. Fried, an instructor of watchmaking for the City of New York, at the George Westinghouse Vocational & Technical High School in Brooklyn. At the age of 11, started training by his father; was later apprenticed and employed by watch importers and, for a while, engaged in his own business of watch repairing; technical adviser to the Watch Dealers Association; also

technical director to the American Watchmakers Institute and horological editor for the Jewelers Circular Keystone, the largest trade publication in the United States; has served as consultant to the Federal Trade Commission and several of the largest watch companies in the United States, and is a certified master watchmaker.

Julian Lazrus, an executive of the Benrus Watch Company, Inc., manufacturer and distributor of watches, watchcases, and watch movements in Switzerland and in the Virgin Islands; his company has several factories in Switzerland for the production of watch movements which are imported and distributed in the United States. Lazrus visits these plants twice a year for a period of about 3 weeks to observe the production of their merchandise.

Hugues Vaucher, technical director of the Balance Wheel factories in Bienne, Switzerland, manufacturer and dealer in balance wheels for most of the Swiss watch manufacturers, having sold "last year 35,000,000 balance wheels" which is enough to supply more than three-quarters of all the watches made in Switzerland. In 1949, he came to America to work with the Hamilton Watch Co., Lancaster, Pa., and later with the United States Time Corp. at Little Rock, Ark. In 1953, he returned to the balance wheel factories in Bienne, Switzerland, as technical director.

Marc Edouard Nardin, vice director and chief engineer in the research and development section of Longines, in Switzerland, being highly trained in the horological field. From 1947 to 1950, this witness was with the Patek Philippe Co. in Geneva, Switzerland, designing Patek Philippe watches, said to be among the highest in grade and quality.

James O'Shaughnessy, shop superintendent of the Longines-Wittnauer Watch Co. in New York, with 40 years' experience in the watch industry, served his apprenticeship in Ireland in a jewelry store, came to the United States in 1926 and worked for about 8 years as a watchmaker in one store and for 10 years in another. For about 5 years, was chief instructor in the Taus School of Watchmaking and, in 1953, became superintendent at the Longines-Wittnauer plant where he has about 40 watchmakers under his direct supervision.

The following six witnesses were introduced by the defendant:

Ernest W. Drescher, mechanical engineer and manager of the quality control section of consumer products with the Bulova Watch Co.; formerly with the Hamilton Watch Co., where he spent 1 year in student training, 3 years in the mechanical department, about 17 years in watch-movement design, becoming familiar with all phases of watchmaking, and the balance of the time in quality control.

Harold L. Rapp, advertising manager of Bulova International; having joined that firm in 1941 as a journeyman in the assembly departments; later, spent some time in the manufacturing departments; for about 7 years, was manager of a watch importing concern, known as the Wyler Watch Co.; returned to Bulova as editor of a publication, known as "The Watch Repair Digest"; later, became sales manager of the Eterna Watch Co.; again returned to Bulova.

Arthur B. Sinkler, president and chairman of the board, Hamilton Watch Co., Lancaster, Pa., engaged in the manufacture and sale of jewel lever watches. In addition to the factory at Lancaster, his company owns and operates assembly plants in Switzerland and in the Virgin Islands, and in Tokyo. His experience with Hamilton began in 1935, when he was trained in its assembly departments and engaged in what is known as position adjusting. After several years' experience in various departments of the company, he became executive vice president in 1953 and president of the company in 1954, the position he now holds.

Richard W. Slaugh, manager of foreign technical service of the Hamilton Watch Co., which he joined in 1919 as an errand boy; later, transferred to the service department, where he repaired

watches as a pieceworker until 1935; then became supervisor of inspection of purchase material and supervisor in several manufacturing departments until in 1938 he was transferred to the research department; in 1947, succeeded Mr. Sinkler as foreman in charge of assembly research, and, in 1948, was appointed head watchmaker.

Max J. Schwartz, technical director of the Bulova Watch Co.; started learning watchmaking trade as a boy with his father in 1920; in 1925, went into the jewelry and watchmaking business for himself; in 1944, accepted an invitation from the Bulova Watch Co. to take a job as head instructor of a new watchmaking school. After several years as an instructor, he went on lecture tours for the Bulova Watch Co., giving instruction on various technical subjects in the watchmaking field, including adjustments.

Horace A. Bowman, employed by the National Bureau of Standards, Washington, D. C., in 1946, as a physicist in the time section in the capacity of assistant to the chief of the section, which was engaged in the testing of timing equipment; assistant chief of the mass and volume section for the past year and a half.

It is observed that three of defendant's witnesses were associated with the Hamilton Watch Co. and two others were in the employ of Bulova Watch Co.

It would be difficult to present in a case of this kind a more representative group of knowledgeable witnesses embracing manufacturers, importers, dealers, technicians, and executives, with lifelong experience in the vast watch industry both in the United States and in Switzerland.

The testimonial record is voluminous, some 700 pages, and a detailed analysis of it would unduly expand the framework of this opinion.

Various exhibits were received in evidence on behalf of the parties hereto, but rather than a detailed listing of said exhibits, reference to them will be made in the course of the decision, if necessary.

Plaintiffs approach the case from the following three major premises:

1. The subject watch movements were properly marked "unadjusted" because they are, in fact, "unadjusted."

2. Paragraph 367 leaves to the manufacturer the determination whether a watch movement should be marked "unadjusted" rather than with a particular number and class of adjustments.

3. The collector's decision is in direct conflict with 27 years of settled customs practice.

With the use of the certificates attached to the invoices to which the protests relate (said certificates being required by T.D. 54286, supra), plaintiff's witnesses were interrogated in detail concerning the commercial significance of the work that had been performed on the various movements.

The witnesses were positive in their statements that the manipulation of the movements shown by the certificates was nothing more than repairs or correctional processes to eliminate manufacturing defects and could not in any proper sense be regarded as amounting to adjustments to position.

As a matter of fact, plaintiffs' witnesses could find no substantial difference between the movements now in controversy and those conceded by defendant to be unadjusted, namely, the Graef movements and one of the Longines movements. Plaintiffs have established that the meaning of the term "adjusted to position" has the same significance in Switzerland as it has in the United States.

According to plaintiffs' witnesses the concept of "adjustment to position" connotes a skillfully manipulated movement to produce a watch of high quality.

Certain criteria recognized by the trade in determining "position adjustment" are:

First, a period of testing requiring the timing of a movement for a minimum of 24 hours in each of the positions to which a movement is being adjusted.

Secondly, there are types of tolerances which must be satisfied. In other words, it is important that a movement should be made to perform with a high degree of accuracy in each position and be consistent from day to day, with the result that it performs within a tolerance of 10 or 15 seconds of perfect time in 24 hours. Obviously, it requires much greater skill to manipulate a watch movement, as above indicated, than to acquire a normal factory tolerance of 45 seconds. (Note T.D. 54286.)

Thirdly, a trade consideration, upon which plaintiffs' witnesses were agreed, was that testing in five or six positions is desirable in position adjustment, although some stated that a movement might be considered adjusted if it were tested in three positions. The witnesses were positive, however, that the movements in controversy, which had been subjected to a two-position test only, could not be regarded as "adjusted to position." Even some of defendant's witnesses agreed that adjustment to position may be accomplished by the skillful work expended on a movement, as above indicated. Nevertheless, they contended that a movement may be adjusted without such elaborate treatment. Not only does the process of adjustment to position require the exercise of great skill, it is also an expensive one. One witness testified that the cost of position adjustment by his company exceeds the cost of the movement itself.

Inasmuch as the record discloses that the articles in issue do not measure up to the foregoing criteria necessary for watch movements to be considered as adjusted to position, and since the manipulation of the movements indicated in the certificates attached to the invoices, in conformity with T.D. 54286, has been shown by the evidence to be the repairing of manufacturing defects to bring the movements up to the minimum required by the manufacturers' specifications, the record herein supports the position of plaintiffs that the instant watch movements are, in fact, unadjusted, as marked.

Although T.D. 54286 states that "no change should be made" in T.D. 50277 (3), supra, plaintiffs contend with force and with much show of reason that T.D. 54286 seeks to imprint a definition of the phrase "position adjustment" inconsistent with the trade understanding of those words, as explained above.

The evidence in this case is to the effect that watch movements of the kind under consideration, throughout the life of the Tariff Act of 1930 until the effective date of T.D. 54286, had been marked "unadjusted" and assessed with duty accordingly. It is to be noted that T.D. 50277, supra, had no material effect upon the classification of said watch movements.

There is testimony from the chief executive of the Longines-Wittnauer Watch Co., Inc., that, during the period from 1930 to 1957, his firm imported some ten million movements which were classified and assessed with duty as "unadjusted" movements.

The president of the Benrus Watch Company, Inc., testified that his company had imported between ten and fifteen million movements during that period, classified as unadjusted. Jean R. Graef testified that every movement imported by him from Switzerland during that period was marked "unadjusted," and duties were levied accordingly.

It is significant that the issuance of T.D. 50277(3) resulted in no change in the manner of marking imported movements as "unadjusted." And, although T.D. 54286 purported to be merely a clarification of T.D. 50277, nevertheless, it, in substance, placed a construction upon the meaning of the word "unadjusted" so at variance with its previously known interpretation and application by importers and classifying officers to definitely create a change in administrative practice in the classification and assessment of duty.

Further indication of a change of practice is suggested in the concluding paragraph of T.D. 54286, which reads—

"In order to provide sufficient time to comply with these require-

ments this amendment shall become effective after 180 days after publication in the weekly Treasury Decisions."

Since the issuance of T.D. 54286, the records of this court disclose that importations of watch movements have been marked "adjusted" to avoid nondelivery by the collector of customs, and scores of protests (other than the four here under consideration) have been filed seeking to recover the additional duty imposed by reason of the marking. In said protests, one of the reasons for objecting to the collector's action is set forth as follows:

"That the said movements were marked to indicate two (2) position adjustments solely because of the provisions of the said Treasury Decision (T.D. 54286), and that prior to the promulgation thereof imported watch movements, manufactured or produced in substantially the same manner as the instant movements, were marked 'unadjusted' and were uniformly so classified and assessed by you for duty purposes since the enactment of the said Tariff Act of 1930."

For many years, it has been a settled rule of statutory construction that a long-continued customs practice applies with peculiar force to the interpretation of customs laws. United States v. W. N. Proctor & Co., 1 Cir., 145 F. 126 (1906). In the course of its opinion in that case, the court observed—

"* * * There is a long and well-known series of decisions by the Supreme Court, holding that a settled practice of the Treasury Department under the circumstances before us, where originally there might have been a doubt, affords a rule of statutory construction of the highest authority. * * *"

United States v. Boyle Mfg. Co., Inc., 31 CCPA 1, C.A.D. 240, is authority for the position "That a finding may be based upon inferences drawn from established facts is well established." (Citing 32A C.J.S. Evidence § 1042.) In our opinion, the inference may clearly be drawn from the evidence here presented that a long-continued unbroken administrative practice was terminated by the promulgation of T.D. 54286.

On the effect of long-established practice, our appellate court stated, in the case of United States v. Electrolux Corporation, 46 CCPA 143, C.A.D. 718—

"It is our opinion that in view of the long established practice of classifying the instant merchandise [finished electrical floor polishers], and goods closely akin to it, under the electrical articles paragraph 353, as shown by the foregoing history, such classification should not have been disturbed, and should not now be disturbed, in the absence of compelling reasons and therefore that the judgment below must be affirmed unless appellant makes a very clear showing of error. The period of consistent classification here is nearly as long as that involved in United States v. H. Bayersdorfer & Co., 16 Ct.Cust.App. 43, T.D. 42717, wherein our predecessor court said, referring to a change made by department order after 17 years,

"Such a long-continued administrative classification of the merchandise should not be disturbed at this late day. Importers have a right to rely on long-continued administrative practice and if any change is to be made it should be made by Congress * * *."

Note, also, United States v. D. H. Grant & Co., Inc., 47 CCPA 20, CAD 723, cited by plaintiffs.

Applying the reasoning of the authorities above cited to the facts adduced herein, we agree with plaintiffs that the 27 years' practice of permitting entry as unadjusted watch movements, such as those here in issue, timed in two positions, with a tolerance of 45 seconds or less, and the manipulation of said movements constituting nothing more than repairs or correctional processes to elimin-

ate manufacturing defects, "should not now be disturbed, in the absence of compelling reasons."

Careful research fails to reveal any litigation in this court testing the application of the words "adjusted" and "unadjusted" during or prior to the Tariff Act of 1930, other than the present proceedings—with the exception of United States v. Gruen Watch Co., 23 CCPA 183, T.D. 48029 (1935).

The Gruen case differed factually from the present one. The watch movements in that case, in their original condition as imported, had been adjusted to position and were so marked. Subsequently, however, the movements had been returned to Switzerland for repair and while being repaired the adjustments were destroyed. It appears that whereas the movements were not readjusted, the original markings remained on the plates. The importer contended that so long as the movements were no longer adjusted, duty should not be assessed according to the marking. The court of appeals rejected this argument stating—

"We see no escape from the position that if the involved watch movements had been imported, as distinguished from returned, and had been subject to the duties imposed by said paragraph 367(a), the collector would have been compelled to add a duty of $1 for each adjustment according to the marking, and it would have been wholly immaterial whether the movements had been in fact adjusted. The statute required him to assess duty against the watch movements, if imported, 'in accordance with the marking.' "

Plaintiffs contend that the quoted language supports their contention that paragraph 367 leaves to the manufacturer the determination whether a watch movement should be marked "unadjusted" rather than with a particular number and class of adjustments.

We do not attach the same depth of meaning and significance to the Gruen case as do the plaintiffs. The factual differences between that case and the in-

stant one do not, in our opinion, give to the Gruen case the compelling effect assigned to it by plaintiffs.

We have carefully scrutinized the record before us and all relevant surrounding circumstances, and we find the weight of competent evidence tips the scales in favor of the plaintiffs' claim that the contested movements were properly marked "unadjusted" within the contemplation of paragraph 367(j).

The protests are sustained, and judgment will issue directing the collector of customs to permit delivery of the subject movements and liquidate the entries in accordance with the views expressed herein.

